In re ERIN FOOD SERVICES, INC., Debtor.

CAMBRIDGE MERIDIAN GROUP, INC./MICHAEL E. WEINGARTEN, Trustee of Erin Food Services, Inc., Plaintiffs,

v.

CONNECTICUT NATIONAL BANK, as it is Indentured Trustee, the Travelers Insurance Co., the Travelers Corporation, the Travelers Indemnity Co., General American Life Insurance Co., Home Life Insurance Co., Home Life Financial Assurance Corp., the Penn Insurance & Annuity Co., and the Prospect Co., and David W. Murray, Defendants.

David W. MURRAY, Plaintiff-in-Counterclaim,

v.

CAMBRIDGE MERIDIAN GROUP, INC./MICHAEL E. WEINGARTEN, Trustee of Erin Food Services, Inc., Defendants-in-Counterclaim.

Bankruptcy No. 89–12250–HAL. Adv. No. 90–1052.

United States Bankruptcy Court, D. Massachusetts.

July 16, 1990.

James D. McGinley, Celeste P. Duffy, Gaston & Snow, Boston, Mass., for plaintiffs.

Evan D. Flaschen, Jeffrey L. Williams, Hebb & Gitlin, P.C., Hartford, Conn., J. Christopher Marshall, Joseph A. Foster, McLane, Graf, Raulerson & Middleton, P.C., Manchester, N.H., for defendants.

Harold B. Murphy, Joan N. Feeney, Hanify & King, Boston, Mass., for David Murray.

## STATUS OF SECURED CLAIM

HAROLD LAVIEN, Bankruptcy Judge.

Plaintiff, Cambridge Meridian Group, Inc./Michael E. Weingarten ("Trustee"), Trustee of Erin Food Services, Inc. ("Erin Foods"), was appointed Chapter 11 Operating Trustee of Erin Foods in May of 1989. Erin Foods is engaged in the business of operating Burger King franchised restaurants in New Hampshire and northeastern Massachusetts. David W. Murray ("Murray") directly owned 100% of the stock of Erin Foods until April 1, 1985, when he took ownership indirectly through a holding company, Hospitality Holding Corp. ("HHC"). Erin Foods opened its first restaurant in 1973 and currently operates 28 restaurants.

From its formation, the basic structure of Erin Foods has remained essentially the same. Murray had the exclusive rights to develop Burger King franchises in six southern New Hampshire counties through

a series of exclusive agreements with Burger King Corporation. Murray, through the Murray entity Erin Realty Company ("Erin Realty") and BK Construction Co., Inc., would respectively purchase and develop real estate sites into Burger King restaurants and finance the acquisition and construction costs with local New Hampshire banks who were given first mortgages on the restaurants. Erin Foods would then operate the Burger King restaurants pursuant to franchise agreements issued to Murray.

Twenty-two of the real estate parcels upon which the Burger King restaurants currently operate are owned by Murray and are leased to Erin Foods; the remainder of the six restaurants are located upon land leased to Murray and subleased to Erin Foods. Murray, additionally, owns other parcels used in connection with or held for development as Erin Foods Burger King restaurants.

Through July 30, 1987 it had been Erin Foods' practice to lease the real estate upon which the Burger King restaurants operated under long-term leases which called for Erin Foods to pay Murray a rent based upon an 8% of gross revenues formula. A floor was built into the rent formula to insure a minimum payment. An 8½% payment arrangement with a minimum established payment is common in the Burger King franchise business.

In addition to Erin Foods, which operates the Burger King restaurants exclusively, Murray also owned corporations operating specialty upscale restaurants in New Hampshire (the "Specialty Restaurants") and the Bedford Village Inn. HHC had held these additional corporations since April of 1985. In 1986, in order to comply with New Hampshire laws proscribing vertical integration in the alcohol industry, Murray transferred the Specialty Restaurants and Bedford Village Inn operating companies out of HHC and into various trusts.

Murray had borrowed many millions of dollars in order to acquire the Specialty Restaurants, the Bedford Village Inn, a beer and liquor distributorship, and a golf course as well as large personal residences or vacation homes in Bedford, New Hampshire, in Boston, on Beacon Street, in Moultonboro, New Hampshire, and in Nantucket, Massachusetts. Much of the monies which Murray borrowed to fund his expanded enterprises were borrowed through Erin Realty and secured by guarantees of Erin Foods. Consequently, in addition to paying rent to Erin Realty (Murray) from 1982 through July 30, 1987, Erin Foods steadily advanced funds to Erin Realty (Murray) and only booked and recorded the transactions in its "due from affiliate" account. The records of Erin Foods were properly maintained and certified by Arthur Young in financial reports dated March 31, 1987.

In January of 1987, Salomon Brothers circulated to its contacts a Private Placement Memorandum ("PPM") containing extensive discussion, financial analyses and photographs of the various Erin Foods Burger King restaurants. The PPM proposed $45 million of refinancing and $25 million of revolving credit for future expansion of the Erin Foods' Burger Kings. The PPM did not mention the specialty restaurants, and did not mention that much of the $45 million would in fact be used to pay debt unrelated to the Burger King restaurants.

Salomon Brothers forwarded a PPM to Travelers, and Travelers accepted the proposal, subject to due diligence and legal documentation. The $45 million "Series A" Notes were eventually purchased as follows:

| | |
|---|---|
| Travelers Insurance | $20,000,000.00 |
| Penn Insurance | 5,000,000.00 |
| Travelers Corporation | 7,000,000.00 |
| Travelers Indemnity | 3,000,000.00 |
| General American | 5,000,000.00 |
| Home Life | 4,000,000.00 |
| Home Financial | 1,000,000.00 |
| | $45,000,000.00 |

The Series B Notes were purchased by the Prospect Company.

Under the intricate documentation, Erin Foods obligated itself to repay all borrowings under the Series A Notes totalling $45 million, and the Series B Notes, totalling up

to $25 million. Interest was fixed at $10\frac{1}{4}\%$ on the Series A Notes and floated in a slightly higher range on the Series B Notes.

On July 30, 1987, the Travelers loan closed, and proceeds were distributed together with the execution of the Master Lease. The purchase and the distribution of the proceeds of the Series A Notes and the Series B Notes are collectively referred to as the "Closing Transactions". Proceeds of the $45 million Series A Notes were commingled with $7.5 million of the Series B notes at Connecticut National Bank ("CNB"), the indenture trustee. CNB wired the funds directly to Murray's and Erin Foods' creditors, with less than $2 million going directly to Erin Foods. Erin Foods executed a so-called Master Lease at closing, under which Erin Foods was obligated to pay as rent to Erin Realty (Murray) the total amount of principal and interest due under the Series A and Series B Notes. Murray, simultaneously, delivered to Erin Foods two Notes totalling $43,646,-518.25, payable with $10\frac{1}{4}\%$ interest (the Series A Note rate) in semi-annual installments. These, in turn, were assigned to Travelers. Additionally, Murray issued a guarantee of all obligations to Travelers. The Notes and the guarantee were non-recourse to Murray, meaning that they were supported only by the Erin Realty real estate not including the two Burger King sites, Laconia and Goffstown, owned by Erin Foods. This transaction left Erin Foods insolvent both on a balance sheet and cash flow basis. The trustee alleges that funds were distributed in four categories.

*Category A.* Payment of Murray obligations, at least some of which were incurred for Murray's non-Burger King interests such as specialty restaurants and Bedford Village Inn, from which Erin derived no benefit. Approximately $16.1 million, plus transaction costs and interest. Unfortunately, the trustee's allegations are not fully supported by the evidence.

*Category B.* Payment of acquisition costs tangentially related to Burger King developments. Approximately $5.5 million

paid on July 30, 1987; $2 million paid thereafter; plus transaction costs and interest.

*Category C.* Payoff of antecedent acquisition and construction first mortgages on Burger King Restaurants, including Bear Right. Approximately $16.7 million; plus transaction costs and interest.

*Category D.* Repayment of Erin loans and the furnishing of working capital to Erin. Approximately $12.1 million on July 30, 1987, and $1.5 million thereafter; plus transaction costs and interest.

Salomon Brothers was hired by Murray to arrange a consolidation and refinancing after local attempts to refinance failed. The Private Placement Memorandum which was the basis of the ultimate Travelers financing, was circulated in January 1987. Starting with that Memorandum, continuing in the due diligence study of Travelers, and in the testimony in court, it was clear that all the parties except, of course, the unsecured creditors, were aware of the consistent intention to treat the Burger King operation as a single economic entity and to legally structure the transaction to carry that intention out. Considering the many hats worn by Murray and the control he exercised over the various operations, this was the only realistic manner in which the lenders could get meaningful security. However, Travelers was on notice that the intended obligor was a distinct legal entity with its own creditors. It is arguable, however, that those creditors would benefit from pulling together all of the essential pieces of the Burger King operation regardless of who actually held legal title, but they could only be hurt by assuming indebtedness for any Murray obligation that had no direct or even indirect relation with or benefit to the Burger King business. Travelers knew, or should have known, that such unrelated refinanced debt was included under the circumstances unique to this financing and, therefore, had a duty to inquire as to the propriety of including these unrelated third-party debts and upstream guarantees. *See, e.g., Dahnken, Inc. of Salt Lake City v. Wilmarth,* 726 P.2d 420 (Utah 1980); *Hansen v. Cramer,* 39 Cal.2d 321, 245 P.2d 1059

(1952), and authorities collected at 30 ALR 2d 1209 and later case service; *Cf. In re Lawrence Paperboard Corp.*, 76 B.R. 866 (Bankr.D.Mass.1987, Gabriel, J.). The situation here is much the same as the ineffective security interests in leverage buyouts. For example, it was held subject to fraudulent conveyance and the bank mortgage was invalidated where bank knew or should have known that there was a lack of consideration for the loan. *U.S. v. Tabor Corp.—Gleneagles*, 803 F.2d 1288 (3rd Cir. 1986); *In re Metro Communications, Inc.*, 95 B.R. 921 (Bankr.W.D.Pa.1989); *Wieboldt Stores, Inc. v. Schottenstein*, 94 B.R. 488 (N.D.Ill.1988). It should be noted that the funds never were in the debtor's possession but were direct payments by the secured parties to creditors including those for golf course construction and other clearly, non-Burger King restaurants. The July 30, 1987 funds were not given to the debtor but distributed directly from the lenders to the creditors. A simple eyeballing of the evidence of indebtedness would have revealed or at least raised a question as to the absence of the debtor as a real obligor. Further, the very language in Salomon Brothers Placement Memorandum placed Travelers on notice:

> For tax reasons while EFS will be the obligor on the notes, $34.4 million of the proceeds will be loaned to Erin Realty to retire its existing 3rd party indebtedness.

Also, the extensive Salomon memorandum dealt only with the Burger King related property and did not include the golf course, the specialty restaurants, etc. This was not, however, a hidden set of obligations and were, or should have been, apparent in Travelers' due diligence study.

With this background, the Court must review the evidence and the law to determine, first, how much of the $61,741,000 that Travelers claims as a secured debt was of no benefit to the debtor; and, possibly ancillary to that, whether these were facts known to Travelers, or should have been known? Second, what affect does that have on Travelers' secured claim?

Initially, the parties have argued and briefed some preliminary matters that must be addressed.

■ The Trustee has standing to challenge the Travelers secured status under 11 U.S.C. § 544(b).

> The Trustee may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim that is allowable under Section 502 of this Title ...

The Trustee has established that there was at least one unsecured creditor with a § 502 allowable claim who could bring a fraudulent conveyance action under the New Hampshire Fraudulent Conveyances Act (N.H.Rev.Stat.Am. 545). The Internal Revenue Service, New Hampshire Department of Taxation, Michael Spector and the Spector Trust all had and still have unsecured claims that are, at least in part, all allowable claims under 11 U.S.C. § 502.

■ It is basic horn book law that the plaintiff has the burden of proof[1] and that, except where altered by statute or case law, the preponderance of evidence in civil cases is the plaintiff's burden. Relief is sought under New Hampshire's Fraudulent Conveyance Law and, therefore, New Hampshire law governs the burden of proof[2]. There is no New Hampshire law directly on point, but such as there is indicates that proof of actual fraud requires clear and convincing evidence[3] and that, otherwise, the burden is a preponderance. The counts in plaintiffs' complaint alleging actual fraud have already been disposed of. The constructive fraud provisions of N.H. Rev.Stat.Am. 545:11 require no proof of intent or any *mens rea* but are merely the

---

1. *In re Ear, Nose & Throat Surgeons of Worcester, Inc.*, 49 B.R. 316 (Bkrtcy.D.Mass. 1985).

2. *United States v. Gleneagles Investment Co., Inc.*, 565 F.Supp. 556 (M.D.Penn.1983); *In re Dodd*, 97 B.R. 74 (Bkrtcy.M.D.1989).

3. *Zimmer v. Lang*, 120 N.H. 555, 419 A.2d 400 (1980); *Jenney v. Vining*, 120 N.H. 377, 381, 415 A.2d 681 (1980); *Ibey v. Ibey*, 93 N.H. 434, 436, 43 A.2d 157 (1945).

consequences of the finding of objective facts: was the debtor insolvent, or made insolvent by the transaction, or left with inadequate capital, and did the debtor receive fair consideration? Even the defendants' knowledge is usually relevant. Therefore, the Trustee must prove its case by a preponderance of evidence except as to any count alleging bad faith which must be proven by clear and convincing evidence.

The parties engage in extensive briefing on the effect or lack thereof of *Moore v. Bay*, 284 U.S. 4, 52 S.Ct. 3, 76 L.Ed. 133 (1930) and, while the Court finds the logic of Travelers' argument convincing, the Court declines to rule on this issue as it believes the balance of its findings make it a fascinating detour.

Here, the facts become hard to ferret out. As previously indicated, everyone was aware, even from the initial Private Placement Memorandum, that non-debtor obligations were going to be paid by the debtor. Yet, there is a limit to how far beyond the documents showing the debtor as co-signor or guarantor of the notes and mortgages a lender must go. Clearly, anything related to the Burger King operation was a benefit to the debtor, but we are aware of, at least, a golf course and specialty non-Burger King restaurants which were of no benefit to the debtor.

The Trustee breaks the application of the loan proceeds into four categories.[4] By its own descriptions, all but one item in Category B, and Categories C & D all benefit the Burger King operation and a lender should not have to look any further. That is not to imply that all of the transactions in these categories would not, on analysis, be subject to challenge between Murray and the debtor or even the financing bank, but that is not the issue before this Court. Nor should that be Travelers' burden. However, Category A presents a different concern; for here, quite clearly, from even a cursory examination of the debtor's books and the basic documents, questions immediately arise as to the propriety of some of these items as appropriate obligations of the debtor. Travelers was warned from the Salomon Placement Memorandum that the deal was being structured to include non-debtor obligations, but these were only justified to the extent that they related to the Burger King operations. Travelers had access not only to the debtor's records but, also, to Murray and his records. The books and records as between the debtor and Murray's other entities were fairly complete, showing the flow of funds out of the debtor and those used by the debtor. So what do the books, the exhibits, and the testimony show as to approximately $16.1 million in Category A and one item in Category B?

The following items in Category A were of no benefit to the debtor and those facts were, or should have been, equally clear to Travelers in its due diligence study.

| Payment Made To: | Loan # | $ Payoff | Beneficiary[5] of Payment |
|---|---|---|---|
| Amoskeag Bank | 51051 | 2,540,687 | Proceeds to Personal Account of David Murray |
|  | 10022 | 50,312 | Proceeds for Benefit of Italia, a specialty restaurant |
| BankEast | 700550 | 153,970 | Proceeds not Traceable to Erin |
| Bank of N.H. | 3750 | 79,906 | Proceeds not Traceable to Erin |
|  | 3751 | 89,105 | Proceeds not Traceable to Erin |
| BayBank | 231724 | 694,942 | Proceeds not Traceable to Erin |

---

4. *See* page 24 *supra.*

5. Shwert pgs. 2–219 through 2–226 unrebutted by anything in Travelers' briefs or evidence.

| Payment Made To: | Loan # | $ Payoff | Beneficiary of Payment |
|---|---|---|---|
| N.H. Savings | 72 | 37,627 | Proceeds not Traceable to Erin |
| | 262 | 102,529 | Proceeds not Traceable to Erin |
| | 2738 | 204,864 | Proceeds not Traceable to Erin |
| | 98 | 54,088 | Proceeds not Traceable to Erin |
| Union National | 7948 | 70,386 | Proceeds not Traceable to Erin |
| Westinghouse | | 697,376 | Amount of Original Loan of $10,672,397 not Ascribed to Erin |
| White Mt. Nat'l | 24562 | 58,036 | Proceeds not Traceable to Erin |
| Category A Total: | | $4,833,828 | |

The following items in Category B were of no benefit to the debtor and those facts were, or should have been, equally clear to Travelers before it released funds.

| Payment Made By: | Date | $ Amount | Beneficiary of Payment |
|---|---|---|---|
| Travelers | 8/14/87 | 993,713 | Proceeds Used to Purchase Greenland Warehouse for Silver Bros., a Liquor Distributor owned by David Murray |
| Combined Total: | | $5,827,541 | |

Does the lack of benefit meet the test of fair consideration?

The statute defines fair consideration as follows:

Section 545:3 Fair Consideration. Fair consideration is given for property obligation:

I. When in exchange for such property obligation, as a fair equivalent therefore, and, in good faith, property is conveyed or an antecedent debt is satisfied, or

II. When such property obligation is received in good faith to secure a present advance or antecedent debt in an amount not disproportionately small as compared with the value of the property or obligation obtained.

Clearly, the Bankruptcy Court, sitting as a court of equity, has the power to look through the form of the transaction and to collapse or to divide a series of transactions structured as one. *In re Metro Paper, Inc.*, 18 B.R. 56 (Bankr.D.D.C. 1982); *see also, In re Roco Corp.*, 701 F.2d 978 (1st Cir.1983). The law of New Hampshire requires the Court to allocate loans between those that are fully secured and prioritized, and loans in fact used for an unsecured purpose. *Peterson v. Reilly*, 105 N.H. 340, 200 A.2d 21 (1964). Finally, the rules of law and of equity were not expressly displaced, and are made applicable to the New Hampshire Fraudulent Conveyances Statute (N.H.Rev.Stat.Ann. 545:11), giving further credence to the argument that the transaction must be divid-

ed between the repayment of Murray obligations that did not relate to the Burger King enterprise on the one hand and the repayment of Erin obligations on the other. *See, In re Rodriguez*, 895 F.2d 725, 729 (11th Cir.1990) holding the debtor corporation did not get "reasonably equivalent value" when it is paid the debt of a subsidiary. It is entirely proper to match up the sources of repayment with the assets from which one might logically expect them to be repaid. *Zuk v. Hale*, 114 N.H. 813, 330 A.2d 448 (1974).

### The Transaction of July 30, 1987, Rendered Erin Food Services, Inc. Insolvent.

■ Jack Weisbaum, the witness for the secured lender, testified that the additional debt assumed by Erin did not render the company insolvent. In reaching this conclusion, Weisbaum ascribed a $28.8 million value to the real estate component of the Master Lease. In addition, Weisbaum assigned a value of $26.5 million to the franchise component of the Master Lease. Weisbaum derived these values, however, by capitalizing future expected income streams. As such, these assets are intangible, highly speculative, and open to serious question in a realistic determination of Erin's solvency.

Despite Weisbaum's favorable testimony, the July 30, 1987 transaction seriously damaged Erin's financial condition. The draft comparative financial statements for the fiscal years ended March 31, 1987 and March 31, 1988, prepared by Coopers & Lybrand, *See* Exhibit 34, reveal the drastic deterioration in the company's balance sheet. At fiscal year end 1987, Erin's debt to worth ratio was 3.67:1. By fiscal year end 1988, the company's debt to worth ratio had escalated to 14.92:1 as a result of the $54 million increase in long term debt.

Concurrent with the refinancing of certain mortgage obligations of David Murray as of July 30, 1987, Erin received a mortgage from Murray of approximately $43.6 million. At trial, the value of this line item was questioned and it seems improbable that it is actually worth its reported amount. Michael Weingarten, witness for the Trustee, testified as to the value of Erin's assets and liabilities as of July 30, 1987. He used the pro forma balance sheet as of March 31, 1987, prepared by Coopers & Lybrand, *See* Exhibit 1, p.g. 12, as the primary source of information. Weingarten did not adjust the value of the liabilities derived by Coopers & Lybrand and they are as follows:

(000's)

| Liabilities: | |
| --- | --- |
| Current Liabilities: | $ 5,651 |
| Capitalized Leases: | 1,874 |
| Long Term Debt: | 54,216 |
| | $61,741 |

Weingarten did, quite properly, adjust the value of the assets, however, as follows:

(000's)

| Assets: | Pre-adjustment | Post-adjustment |
| --- | --- | --- |
| Current Assets | $ 7,800 | $ 7,800 |
| P & E, net | 9,493 | 10,573 |
| Mortgage Receivable | 43,616 | 19,350 [6] |
| Other Assets | 4,985 | 4,985 |
| | $65,894 | $42,888 |

6. The most significant adjustment is the reduction in the mortgage receivable from $43 mil-

The adjusted value of the assets has a significant impact upon Erin's net worth.

| (000's) | Pre-adjustment | Post-adjustment |
|---|---|---|
| Net Worth: | $4,153 | ($18,853) |

---

Thus, the transaction of July 30, 1987 caused a $23,006 million reduction in Erin's net worth.

The transaction also increased Erin's debt service requirements. During the fiscal year ended March 31, 1987, Erin had lease obligations of approximately $2.6 million. Though the July 30, 1987 transaction purported to give Erin access to rent-free properties for 15 years, the company paid the price in increased loan obligations. In the year after the transaction, Erin was faced with a debt service payment of approximately $5.4 million. This figure did not include the semi-annual principal payments of approximately $2.0 million that were to begin in December of 1990. In the fiscal year that ended March 31, 1988, the draft financial statements prepared by Coopers & Lybrand, Exhibit 34, showed that Erin only generated $3.6 million in earnings before depreciation and amortization, interest expense, and taxes. Clearly, Erin's cash flow did not cover debt service and the company had to draw down funds under its revolving loan with Travelers just to pay the interest on its term debt. In sum, the debtor was insolvent as a result of this refinancing and was left with an inadequate capitalization, as indicated by its immediate need to borrow funds from Travelers to pay the interest on the term financing.

Hence, there is not fair consideration for the Travelers security interest in the amount of $5,827,541 out of the claimed indebtedness of $61,741,000.

Finally, the Trustee alleges that $2,808,290 in interest payments made to Travelers are voidable preferences under 11 U.S.C. § 547.[7] The one year insider time limitation applies since these payments benefitted Murray as an inside guarantor. *Levit v. Ingersoll Rand Financial Corp.*, 874 F.2d 1186 (7th Cir.1989) (Deprizio). Travelers argues that the non-recourse nature of guarantee means no benefit, but that doesn't follow since the larger obligation of Murray's Burger King property has to protect the greater, his likelihood of ultimate liquidation or smaller, his recovery of those assets. The interest payments

---

lion to $19.35 million. Weingarten recognized the mortgage receivable as the net present value of the rental stream that Erin would not have to pay to the Murray estate as a result of entering into the Master Lease. To arrive at the $19.35 million figure, Weingarten estimated the annual rental that Erin would save over a period of 15 years. He started with a base rent of $2.5 million and increased this by a 2.5 percent growth factor each year. He then discounted the rent saved over 15 years by 12 percent to arrive at a net present value of $19.35 million.

7. § 547. Preferences
(b) Except as provided in subsection (c) of this section, the trustee may avoid any transfer of an interest of the debtor in property—

(1) to or for the benefit of a creditor;
(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;
(3) made while the debtor was insolvent;
(4) made—
(A) on or within 90 days before the date of the filing of the petition;
(B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and
(5) that enables such creditor to receive more than such creditor would receive if—
(A) the case were a case under Chapter 7 of this title;

were payments of debtor's funds on an antecedent debt while the debtor was insolvent, that since it was a dollar-for-dollar payment while debtor was insolvent based on this now undersecured claim would result in a larger payment than the creditor would get in a Chapter 7. *See, In Matter of CHG International, Inc.*, 897 F.2d 1479, 20 B.C.D. 296 (9th Cir.1990) holding that interest on a long-term debt is a preference and not a payment in the ordinary course. Also, the corporation's purchase of its own stock secured by a mortgage while solvent and recorded held no value and must be *solvent* when installment payments are made. *In re Washington Plate Glass Co., Inc.*, 711 F.2d 414, 10 B.C.D. 827, 27 B.R. 550 (D.Col.1982).

**The Advances Made Under the Revolving Credit Agreement were a Contemporaneous Exchange for New Value within the Meaning of 11 U.S.C.A. § 547(c)(1).**

■ The record reveals that within a one year period prior to March 28, 1989, the date of the bankruptcy filing, the debtor made interest payments on its term debt in an aggregate amount of $2,808,290. The dates and the amounts of the payments are as follows:

| Date | $ Amount |
|------|----------|
| April 1, 1988 | 308,011 |
| July 1, 1988 | 1,790,750 |
| July 5, 1988 | 709,529 |
| Total: | $2,808,290 |

*See* Transcript at 2–231–2–232. The Trustee argues that the Court should void these payments as preferences under 11 U.S.C.A. § 547.

In response, the secured lenders assert that the Court should not void these payments because they were part of a contemporaneous exchange for new value within the meaning of 11 U.S.C.A. § 547(c)(1). The secured lenders argue that they advanced funds under the revolving credit agreement so that the debtor could pay interest due on the long-term loan. The dates and amounts of the advances are as follows:

| Date | $ Amount |
|------|----------|
| March 25, 1988 | 750,000 |
| June 30, 1988 | 2,088,770 |
| July 1, 1988 | 411,220 |
| Total: | $3,249,990 |

*See* Transcript at 2–231–2–232.

The parties agree that the secured lenders did; in fact, advance funds in a substantially contemporaneous exchange for the payment of interest within the meaning of 11 U.S.C.A. § 547(c)(1)(B). *See* Trustee's post-trial brief at 43. The Trustee argues, however, that the secured lenders do not have a defense under 11 U.S.C.A. § 547(c)(1), because the creditors did not have any intention of contemporaneous exchange for new value given to the debtor, i.e., Travelers made the loan without the intention that the funds be used to pay interest. This argument fails, however. The debtor's drawdown request for the March 25, 1988 advance specifically stated that a portion of the funds were to be used to make the March 31, 1988 interest payment.[8] *See* Exhibit 22—Procedures for Takedown of Funds Under Revolver. Though the draw-

---

**8.** The debtor had made a similar request for a drawdown of funds on December 31, 1987, a portion of which would be used to pay interest due on that date.

down requests for June 30, 1988 and July 1, 1988 are not included in Exhibit 22, it seems likely that the secured lenders understood that the advanced funds would be used to pay interest. The debtor had already established a precedent for such conduct and the amount advanced on June 30, 1988 and July 1, 1988 nearly equaled the amount of the interest paid on July 1, 1988 and July 5, 1988.

Thus, there is no voidable preference. Travelers Group has a valid secured claim against the debtor in the amount of $55,-913,459. The remaining $5,827,541 is equitably subordinated to the claims of the debtor's creditors who, as a matter of weighing the equities, should be paid from the debtor's assets which they helped to create, payment to the other creditors should be prior to this portion of the Travelers' debt which went exclusively for Murray's benefit and was of no benefit to the debtor. These facts were known, or should have been known, to the Travelers Group when it made the advances. *In the Matter of Virtual Networks Service Corp.*, 902 F.2d 1246, 20 B.C.D. 816 (7th Cir.1990).