**In re BUYER'S CLUB MARKETS, INC., Debtor.**

**H. Christopher CLARK, Trustee, Plaintiff,**

**v.**

**A.B. HIRCHFELD PRESS, INC., Defendant.**

**Bankruptcy No. 89 B 4395 J.**
**Adv. No. 89 E 0791.**

United States Bankruptcy Court, D. Colorado.

Jan. 24, 1991.

Paul G. Quinn, Denver, Colo., for trustee, plaintiff.

Curt Todd, Haligman & Lottner, P.C., Englewood, Colo., for defendant.

### DECISION AND ORDER

ARTHUR N. VOTOLATO, Jr., Bankruptcy Judge.[*]

Heard on the Trustee's complaint to recover $125,000 from the defendant, A.B.

---

[*] For the District of Rhode Island, sitting by designation.

1. The four payments in issue are: (1) a February 1, 1989 check in the amount of $50,000; (2) a February 15, 1989 check in the amount of $25,000; (3) a February 28, 1989 check in the amount of $25,000; and (4) a March 16, 1989 check in the amount of $25,000.

Hirschfeld Press, Inc. ("Hirschfeld"), as an alleged § 547(b) preferential transfer.

At issue is whether four payments[1] totaling $125,000 made by Buyer's Club Markets, Inc. ("Buyer's Club"), to Hirschfeld,[2] within the 90 days preceding the debtor's Chapter 11 filing were preferential transfers, or were in the parties' ordinary course of business.

### 11 U.S.C. § 547(b)(5)

It is agreed that the only element in dispute under § 547(b) is subsection (5), which provides:

(b) Except as provided in subsection (c) of this section the trustee may avoid any transfer of an interest of the debtor in property—

(5) that enables such creditor to receive more than such creditor would receive if—

(A) the case were a case under chapter 7 of this title;

(B) the transfer had not been made; and

(C) such creditor received payment of such debt to the extent provided by the provisions of this title.

Hirschfeld correctly points out that the burden of establishing the elements of a § 547(b) claim rests with the trustee, *see* 11 U.S.C. § 547(g), and, at the conclusion of the trial, asserted that the Trustee failed "to adduce sufficient proof to sustain his burden of proving the last element of a preferential transfer under § 547(b)(5)." (Defendant's Post-trial Memorandum, May 31, 1990, p. 9). We disagree with Hirschfeld, and for the reasons discussed below, conclude that the payments in question are indeed preferential.

■ At trial, a hotly contested issue was what date to apply in a § 547(b)(5) dispute. While the Court did not rule on the question at that time,[3] we have previously

---

2. The four payments were made on invoices totaling $302,242.75.

3. At the close of the plaintiff's direct case, we stated that:

Whatever apparent conflict seem to appear in the language between the Tenna case and these others that have been cited in opposition, I think is a result of the practical fact of

held,[4] and now rule herein, that "the day of the filing of the ... petition" should be used. *Monzack v. ADB Investors (In re EMB Associates, Inc.),* 100 B.R. 629, 632 (Bankr.D.R.I.1989). It is with this date in mind, April 5, 1989, that we consider the evidence before us.

■ The evidence as to valuation is contradictory and speculative. Ms. Wilkes-Schatz, the debtor's former account supervisor and payable manager,[5] testified, based upon information she obtained while assisting the Trustee in the liquidation of the estate, that *as of May 1, 1990,* unsecured creditors would receive, at most, five percent of their claims. However, when questioned as to the probable liquidation value as of April 5, 1989, the date of the filing, Wilkes-Schatz had no opinion. Mike Borer, the Chief Financial Officer for Hirschfeld, similarly presented his liquidation analysis, calculated as of the date of the Chapter 11 filing. Relying on the debtor's schedules, as well as estimating the value/cost of such relevant items as collectable accounts receivable, legal fees and trustee fees, Borer concluded that if liquidation had occurred on April 5, 1989, unsecured creditors would have realized a 46% distribution. Comparing this figure to the 41% Hirschfeld recovered within the 90 days preceding the filing, the defendant contends that it did not fare better than other unsecured creditors would have on that date.

■ Based upon our review of the entire record, we find Mr. Borer's testimony to be permeated by gross inaccuracies and omissions, rendering his conclusions biased and erroneous. The Trustee correctly points out that Borer did not factor in the increase in unsecured claims after the retrieval of preferential transfers, nor did he make a necessary adjustment regarding the liquidation of the inventory as of the date of the bankruptcy filing, which Arnold Jacobs, the debtor's former vice president in charge of sales and marketing, testified would have produced a much lower return. The Trustee raised numerous other valid questions about Borer's analysis, such as his (1) overstatement *by $606,000,* of the amount obtained on liquidation of certain assets; (2) failure to consider a $150,000 priority tax claim filed by the State of California; (3) his understatement of the amount of wage claims filed; and (4) his (allegedly) erroneous calculation of the expense to the estate resulting from the rejection of leases. Such contradictory evidence supports our concern that a reasonably accurate determination of this element is very elusive (no matter which assessment date is used), and that in view of its speculative nature, we, again, adopt the legal principle[6] that

---

life problem that any Court would be faced with. If Tenna requires Courts to make these liquidation valuation estimates based on the date of the petition, then the only real life valuation or accurate one not subject to dispute would be the final day of reckoning when the case is closed and when the final account is filed. It places a very difficult burden on courts and on parties trying to sustain a position. I think the further away from the closing of a case that we get, the more room there is for error and speculation and the more subjective the valuation judgment has to be.
Transcript, May 11, 1990, p. 40–41.

4. After an exhaustive search we have found no case within this jurisdiction which addresses this issue. Consequently, we rely on our own previous ruling issued in the District of Rhode Island, *Monzack v. ADB Investors (In re EMB Associates),* 100 B.R. 629, 632 (Bankr.D.R.I. 1989), as well as the wealth of authorities presented by Hirschfeld in its Post-trial memo-

randum. (*See* Defendant's Post-trial Memorandum, May 31, 1990, p. 5.)

5. Ms. Wilkes-Schatz currently serves as a consultant to the trustee in this bankruptcy case.

6. This ruling was in fact made by the Court at the close of the plaintiff's case in chief, when the defendant moved, pursuant to Bankruptcy Rule 7041(b), for involuntary dismissal (although the pleading was improperly characterized as a "Motion for Directed Verdict"). At that time we stated that:
in view of the evidence, whether it would be at the conclusion of the evidence or on a motion with a different standard, that there's no—there's no way this Court could find that this would be a hundred percent case, and in that event, I have to agree with the argument and the cases that are relied on by the Trustee.... I think the further away from the closing of a case that we get, the more room there is for error and speculation and the more subjective the valuation judgment has to

"[u]nless the assets in a bankruptcy estate are sufficient to provide in liquidation a one hundred percent distribution to creditors, *any unsecured creditor* holding an unsecured claim who receives a payment during the preference period is in a position to receive more than it would have in a Chapter 7 liquidation." (emphasis added.)[7] *In re EMB Associates, supra* at 633 (citing *In the Matter of Lawrence,* 17 B.C.D. 108, 110, 82 B.R. 157 (Bankr.M.D.Ga.1988) (other citations omitted)).

Even accepting (hypothetically) Borer's liquidation analysis in its best light, there is no way that a 100% distribution could have been made to unsecured creditors on April 5, 1989, and we conclude therefrom that the Trustee has met his burden as to this element.

Therefore, with all the elements of § 547(b) present, the Trustee is entitled to set aside the four transfers in question, unless they fall "within one of the statutory safe harbors for otherwise preferential transfers." *J.P. Fyfe, Inc. of Florida v. Bradco Supply Corporation,* 891 F.2d 66, 69, 19 BCD 1792, 1794 (3rd Cir. 1989) (citing *In re Jet Florida Sys., Inc.,* 861 F.2d 1555, 1557–58 (11th Cir.1988)).

## ORDINARY COURSE OF BUSINESS DEFENSE

■ Hirschfeld, relying on § 547(c)(2),[8] argues alternatively that the payments in question were made in the ordinary course of the debtor's and Hirschfeld's business, and thus fall within an exception to the preference statute.[9]

To establish this position, Hirschfeld must show that "[1] the debtor incurred the underlying debt in the ordinary course of business of the debtor and the transferee [10] ... [2] the debtor made the transfer in the ordinary course of business or financial affairs of the debtor and the transferee ... [and 3] the payment was made according to ordinary business terms." *J.P. Fyfe, Inc. of Florida,* 891 F.2d at 70 (citing *WJM, Inc. v. Massachusetts Dep't of Pub. Welfare,* 840 F.2d 996, 1010–1011 (1st Cir.1988)); *Blasbalg v. Narragansett Electric Co. (In re Miner Industries, Inc.),* 119 B.R. 6, 9 (Bankr.D.R.I. 1990).

To adequately consider this section and its application, a review of the history of the parties' business relationship is required. The debtor operated a retail discount store, and beginning in late 1984, began using the services of Hirschfeld, a printing and publishing company which provided advertising services to the debtor, including the printing of a holiday catalog for insertion in the local newspaper. When a job was completed, Hirschfeld would submit an invoice to Buyer's Club, with terms "net 30 days" either from date of invoice or

---

be. And that's why I think that the language has evolved that in every case unless it's a one hundred percent payout, the creditor who has received a payment within 90 days just automatically is better off than everybody else, so for those reasons the motion to dismiss is denied.

Transcript, May 11, 1990, p. 40–41.

7. Of the $302,243.00 owed to Hirschfeld by the debtor, it recovered $125,000, or 41% of its claim, within 90 days of the Chapter 11 filing, and on May 23, 1989, filed claim number 274 in the amount of $177,242.75 for the balance. Therefore, unless there would have been a 100% distribution on the date of the filing, which no one argues was possible, in addition to the 41% already recovered, Hirschfeld would be receiving an additional payment for the remainder of its claim, $177,000, according to the ultimate distribution. Such an outcome obviously results in Hirschfeld being preferred over other creditors.

8. 11 U.S.C. § 547(c)(2) provides that—

(c) The trustee may not avoid under this section a transfer—

(2) to the extent that such transfer was—

(A) in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee;

(B) made in the ordinary course of business or financial affairs of the debtor and the transferee; and

(C) made according to ordinary business terms;

9. Under 11 U.S.C. § 547(g), Hirschfeld has the burden of proving the nonavoidability of a transfer under subsection (c) of section 547.

10. This element is not in dispute.

shipment. Throughout the five year history of the relationship between these parties, the debtor always paid the specific dollar amount requested on the invoice. In addition, Wilkes–Schatz testified that nearly all of the checks issued were computer generated, and that of the 765 check entries listed in Trustee's Exhibit G, only four of them were not computer generated. Of the four checks at issue, none were for a specific dollar amount corresponding to a particular invoice, two were computer generated, and two were manually issued.[11] While there is a factual dispute as to the length of time that normally elapsed between the invoice date and payment, after examining Plaintiff's Exhibit F, we are unable to discern any specific payment pattern during 1987 and 1988 which would permit classification of the payments in question as outside "the norm."

On January 3, 1989, Buyer's Club cut a check payable to Hirschfeld in the amount of $130,243.09 in full satisfaction of its outstanding balance. Wilkes–Schatz testified however, that Jim McFadden, the then comptroller of the company, directed her to "void out" the check because of insufficient funds in the Buyer's Club account, and the check was voided on January 31, 1989. (*See* Trustee's Exhibit B–7). Buyer's Club's delay in paying this large invoice prompted Borer to contact the company on January 27, 1989.[12] The result of Borer's discussions with McFadden was that, on January 31, 1989, the first of several "new" payment arrangements was entered into between the parties. On that date, Buyer's Club agreed to pay Hirschfeld $50,000 per week toward outstanding invoices, and in fact issued a check in the amount of $50,000 on February 1, 1989. Hirschfeld contends that this latest arrangement became their new ordinary course of business. Although we agree that there is authority to support this proposition, *see First Software Corp. v. Micro Educ. Corp. of Amer.,* 103 B.R. 359 (D.Mass.1988), the instant facts do not sustain such a finding. For instance, during the time in question, Buyer's Club held daily meetings with its staff to determine which creditors it could pay,[13] and on February 15, 1989, because of constant cash shortages, amended its agreement with Hirschfeld to pay $25,000 every other week. Unhappy with this new arrangement, Borer attempted to obtain interest on the outstanding balance, but this was not agreed to by Buyer's Club. Finally, in late March, 1989, James Stuart, the new comptroller for Buyer's Club, sought to initiate yet a third payment schedule, and sent a letter to Borer stating that Buyer's Club intended to increase its payments to $50,000 per week, as of April 6, 1989, until the balance was paid off. (*See* Hirschfeld's Exhibit 3). However, the day before this latest "new deal" was scheduled to commence, Buyer's Club filed its Chapter 11 petition.

While there is no direct evidence that Hirschfeld actually coerced the debtor into making these payments, such actions are irrelevant to our determination of whether a particular payment scheme was in the ordinary course of business. In fact, these payments could have been made at the insistence of the debtor, and still would be preferential. We hold that this type of payment plan, entered into during a period of cash flow shortage, is not in the ordinary course of business, unless specifically agreed to as the new "modus operandi" of the parties. There is no evidence to support such a finding or conclusion. The various and changing payment plan negotiations were in such flux that no new agree-

---

**11.** Manually issued checks are designated by a "999" preceding the check number.

**12.** There is also evidence that during the three years that Mr. Borer was the chief financial officer for Hirschfeld, no meetings ever took place between the parties regarding the debtor's account, until February 17, and March 9, 1989, both within the 90 days preceding the debtor's filing. Moreover, Borer conceded that during the three months before the Chapter 11 filing, he made as many as twenty-five phone calls to Buyer's Club, whereas in the preceding two years he had only telephoned about six or eight times.

**13.** McFadden testified that the only creditors receiving payment were those from whom Buyer's Club was deriving an immediate benefit.

ment could reasonably be considered to have been established, and no pattern was instituted that could constitute a new ordinary course of business.

Accordingly, for all the foregoing reasons, the Trustee's complaint to set aside the payments in question as preferential transfers, is GRANTED.

Enter Judgment consistent with this opinion.