In re ERIN FOOD SERVICES, INC., Debtor,

The TRAVELERS INSURANCE COMPANY, et al., Appellants,

v.

CAMBRIDGE MERIDIAN GROUP, INC., et al., Appellees.

In re ERIN FOOD SERVICES, INC., Debtor.

The TRAVELERS INSURANCE COMPANY, et al., Appellants,

v.

CAMBRIDGE MERIDIAN GROUP, INC., et al., Appellees.

Nos. 91–2175, 91–2176.

United States Court of Appeals, First Circuit.

Heard April 8, 1992.

Decided Nov. 23, 1992.

CYR, Circuit Judge.

Appellants, creditors holding partially secured claims ("appellants" or "secured lenders") against property of the estate of the chapter 11 debtor,[1] Erin Food Services, Inc. ("debtor" or "Erin"), challenge a bankruptcy court order setting aside, as voidable preferences, three installment interest payments Erin made to appellants, within one year of the chapter 11 petition, on an antecedent debt guaranteed by an Erin "insider." Appellants argue that (1) Bankruptcy Code § 550(a) does not permit direct recovery from the non-insider transferees unless the transfers were made within the conventional ninety-day preference period; (2) even assuming the transfers were directly recoverable from the non-insiders under section 550, the trustee did not establish that the insider-guarantor derived a cognizable "benefit" from the transfers, a prerequisite to their avoidance under Bankruptcy Code §§ 547(b)(1), (b)(4), and (b)(5); and (3) as transfers in the "ordinary course of business," the installment interests payments are not subject to avoidance under Bankruptcy Code § 547(c)(2).

# I

## BACKGROUND

In 1971, David W. Murray (the "insider") acquired exclusive franchises from Burger King Corporation to own and operate restaurants in parts of New Hampshire and Massachusetts. Murray established Erin to operate the restaurants. By 1987, Erin was operating more than twenty Burger King restaurants on real estate either leased or subleased from Murray, Erin's sole shareholder. Murray retained title to twenty-two parcels of real estate.

In order to fund an expansion, Erin negotiated a long-term refinancing arrangement with the secured lenders in July 1987. As primary obligor, Erin borrowed $45 million, most of which was disbursed by the secured lenders directly to Erin's existing

Evan D. Flaschen with whom Derek M. Johnson, Charles F. Vandenburgh, Ronald J. Silverman and Hebb & Gitlin, Hartford, Conn., were on brief, for appellants.

James D. McGinley with whom Neil W. Bason and Edwards & Angell, Boston, Mass., were on brief, for appellees.

Before BREYER, Chief Circuit Judge, CYR, Circuit Judge, and STAHL *, District Judge.

---

* Of the District of New Hampshire, sitting by designation.

1. The eight appellants ("secured lenders") are The Travelers Insurance Company, The Travelers Corporation, The Travelers Indemnity Company, General American Life Insurance Company, Home Life Insurance Company, Home Life Financial Assurance Corporation, The Penn Insurance and Annuity Company, and The Prospect Company.

creditors and mortgage lenders. As part of the same refinancing, the secured lenders agreed to provide Erin with a $25 million dollar secured revolving credit account ("RCA"), from which Erin could withdraw funds for future franchise expansion, site acquisition, and working capital. Both loans, totalling $70 million, were secured by an Adjusted Collateral Pool ("ACP"), which included Erin's "cash-flow" assets, such as its equipment and franchise agreements. In addition, the secured lenders obtained Murray's personal non-recourse guaranty on both Erin loan obligations. The guaranty was secured by liens on the twenty-two parcels of real estate owned by Murray.[2]

During the eleven-month period between the loan and the July 5, 1988, installment interest payment, Erin withdrew $3,249,990 from the RCA, including $2,808,290 with which to make the three installment interest payments to the secured lenders as they became due on April 1, July 1, and July 5, 1988. Erin was rendered insolvent. *In re Erin Food Servs., Inc.,* 117 B.R. 21, 29 (Bankr.D.Mass.1990).[3] Within a year of the first installment interest payment to the secured lenders, an involuntary chapter 11 petition was filed against Erin and an operating trustee was appointed. At the date of the petition, the real estate securing Murray's personal guaranty had an approximate value of $19.35 million and Erin's total indebtedness to the secured lenders approximated $61.7 million.

The trustee initiated an adversary proceeding against the secured lenders to recover the three installment interest payments as voidable preferences. *See* Bankruptcy Code § 547(b), 11 U.S.C. § 547(b). The bankruptcy court concluded that $2,089,059 was recoverable directly from the secured lenders as voidable preferential transfers.[4] The secured lenders appeal from the district court judgment affirming the bankruptcy court order. 140 B.R. 14.

## II

## DISCUSSION

A. *Trilateral Preferences: Transfers to Non-insiders During Extended One-Year Preference Period*

The soundness of the avoidance theory adopted by the bankruptcy court ultimately turns on the proper interpretation of Bankruptcy Code §§ 547(b) and 550(a), governing the avoidability and recovery of preferential transfers. Section 547(b) permits the trustee in bankruptcy to avoid certain prepetition transfers of property of the debtor on account of an antecedent debt as a consequence of which a creditor receives more than it would have received in a chap-

---

**2.** Erin and Murray executed a Master Lease, whereby Murray "waived" rent on the 22 parcels for 15 years in return for Erin's agreement to pay off the $45 million loan to the secured lenders. In consideration for Erin's refinancing of the existing mortgages on Murray's real property, Murray gave Erin two personal notes totalling $45 million, which Erin "assigned" to the secured lenders as collateral. *In re Erin Food Servs., Inc.,* 117 B.R. 21, 24 (Bankr.D.Mass. 1990). Like the Murray guaranty, however, the two Murray notes were non-recourse, and the only remedy available to the holder of the notes would have been the right to foreclose on the same real estate collateral securing Murray's guaranty. The bankruptcy court valued Erin's "mortgage receivable," as evidenced by the Murray notes, at $19.35 million, the estimated value of the collateral securing the guaranty. *Id.* at 28.

**3.** The bankruptcy court found that Erin experienced a $23 million reduction in its net worth during the same period, and incurred $54 mil-

lion in long-term debt. During the year following the loan transaction, Erin's debt service totalled $5.4 million; its earnings $3.6 million. *In re Erin Food Servs., Inc.,* 117 B.R. at 28–29.

**4.** The bankruptcy court rejected the defenses asserted by the secured lenders under § 547(c)(1) (transfer "intended by the debtor and the creditor to or for whose benefit such transfer was made to be a contemporaneous exchange for new value given to the debtor") and § 547(c)(2) (transfer "in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee"). The bankruptcy court ruled, however, that the secured lenders had established a partial defense under § 547(c)(4) (transfer made "to or for the benefit of a creditor, to the extent that, after such transfer, such creditor gave new value") as to a portion of the installment interest payments, reducing the recoverable amount from $2.8 million to $2,089,-059.

ter 7 liquidation proceeding.[5] Section 547(b)(4), however, distinguishes between (1) preferential transfers to or for the benefit of an "insider," typically a "director," "officer," or other "person in control of the debtor," Bankruptcy Code § 101(30), 11 U.S.C. § 101(30), which are avoidable if made within one year of the date of the petition; and (2) transfers to or for the benefit of non-insiders, which are not avoidable unless made within ninety days. Bankruptcy Code § 547(b)(4), 11 U.S.C. § 547(b)(4). The one-year preference period is designed to inhibit insiders—entities normally privy to inside financial information long before it becomes available to arm's-length creditors—from influencing the insolvent debtor to deplete its remaining assets for the insider's benefit, to the detriment of non-insider creditors. The secured lenders concede that Murray is an Erin "insider."

■■■ The bankruptcy court correctly found that the secured lenders held a secured claim of $53,842,400, a $2,089,059 million unsecured claim, and an equitably subordinated claim in the amount of $5,827,541.[6] On the other hand, Murray, personal guarantor of the Erin debt to the secured lenders, held a contingent unsecured claim against Erin equal to the value of the collateral Murray pledged to secure his non-recourse personal guaranty. The greatly broadened definition of "claim" under Bankruptcy Code § 101(4), as any "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, ... legal, equitable, secured, or unsecured," 11 U.S.C. § 101(4), unquestionably encompasses contingent claims for contribution, reimbursement or indemnification. *See In re C–L Cartage Co.*, 899 F.2d 1490, 1493 (6th Cir.1990); *see also In re Hemingway Transport, Inc.*, 954 F.2d 1, 8 (1st Cir.1992). A "creditor" is an "entity that has a claim against the debtor that arose at the time of or before the order for relief...." Bankruptcy Code § 101(9), 11 U.S.C. § 101(9). Thus, both Murray, the insider, and the non-insider secured lenders, independently qualify as Erin "creditors" on the *same* obligation.

Nevertheless, since Murray alone qualifies as an "insider," only a transfer which conferred cognizable "benefit" on Murray, *see* Bankruptcy Code § 547(b)(1) ("to or *for the benefit* of a creditor") (emphasis added), would trigger the *one-year* preference period under Bankruptcy Code § 547(b)(4) ("creditor ... was an insider").[7] The insider guaranty by Murray ostensibly provided the last link needed to convert these install-

---

**5.** Bankruptcy Code § 547(b) provides:

(b) Except as provided in subsection (c) of this section, the *trustee may avoid any transfer of an interest of the debtor in property—*
(1) to or *for the benefit of a creditor;*
(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;
(3) made while the debtor was insolvent;
(4) made—
(A) on or within 90 days before the date of the filing of the petition; or
(B) *between ninety days and one year before* the date of *the filing of the petition, if such creditor* at the time of such transfer *was an insider;* and
(5) that enables *such creditor* to receive more than *such creditor* would receive *if—*
(A) *the case were* a case *under chapter 7* of this title [11 U.S.C. §§ 701–766];
(B) the transfer had not been made; and
(C) *such creditor* received payment of such debt to the extent provided by the provisions of this title [11 U.S.C. §§ 101–1330].
11 U.S.C. § 547(b) (emphasis added).

**6.** The bankruptcy court ruled that $5,827,541 of the secured lenders' $61,741,000 claim against Erin's estate should be equitably subordinated to the claims of Erin's unsecured creditors, pursuant to Bankruptcy Code § 544(b), 11 U.S.C. § 544(b). The court found the secured lenders liable for constructive fraud, under the New Hampshire fraudulent conveyance statute, on the portion of the debt they knew or should have known was to be used to pay off other debts of Murray (or his businesses) unrelated to Erin. *See In re Erin Food,* 117 B.R. at 29 (citing N.H.Rev.Stat.Ann. § 545:11 (1987)). The secured lenders have not appealed the equitable subordination ruling.

**7.** In the typical bilateral preference involving the debtor and one "creditor," there is little difficulty determining the appropriate preference period (ninety days or one year) for application under subsection 547(b)(4). Moreover, were we confronted with a simple bilateral transfer these secured lenders would not have been "preferred," since Erin made all three interest payments more than ninety days before the filing of the involuntary chapter 11 petition.

ment interest payments into trilateral preferences. There can be no question that an insider-guarantor derives measurable economic benefit from a payment on the guaranteed debt, *to the extent the insider's contingent liability on the personal guaranty is reduced.* The trustee accordingly contends that the installment interest payments Erin made to the secured lenders conferred a *simultaneous* "benefit" upon Murray as well as the secured lenders. Finally, the trustee contends that, as "creditor" Murray received benefit from the installment interest payments made by Erin, the *one-year* preference period applies.

Once the transfer is determined avoidable under section 547(b), the trustee looks to the greatly broadened *recovery* powers conferred by section 550(a).[8] Thus, a trustee may elect to recover the property (or value) involved in an avoided transfer *either* from the "entity for whose benefit such transfer was made" (*i.e.*, Murray) or from the "initial transferee of such transfer" (*i.e.*, the secured lenders). Since section 550(a) makes no distinction similar to that found in section 547(b) between the treatment of insiders and non-insiders, the bankruptcy court ordered the secured lenders to remit the installment interest payments to the trustee even though the secured lenders were not "insiders" to whom a prepetition transfer would trigger the one-year preference period under section 547(b)(4).

**8.** Bankruptcy Code § 550 provides, in pertinent part:

(a) Except as otherwise provided in this section, *to the extent that a transfer is avoided under section* 544, 545, *547*, 548, 549, 553(b), or 724(a) of this title, *the trustee may recover,* for the benefit of the estate, *the property* transferred, or, if the court so orders, the value of such property, *from—*
(1) the *initial transferee* of such transfer *or the entity for whose benefit* such transfer was made; or
(2) any immediate or mediate transferee of such initial transferee.
(b) The trustee may not recover under section (a)(2) of this section from—
(1) a transferee that takes for value, including satisfaction or securing of a present or antecedent debt, in good faith, and without

The bankruptcy court relied on the landmark decision in *Levit v. Ingersoll Rand Fin. Corp. (In re V.N. Deprizio Constr. Co.)*, 874 F.2d 1186 (7th Cir.1989) [hereinafter *"Deprizio"*], which is premised on the presumed "unfair" advantage that non-insider creditors, holding personal guaranties from insider creditors, may have over arm's-length creditors. *See id.* at 1195 (absent the one-year preference period for outside creditors with "insider" personal guaranties, nervous, "non-guaranteed" creditors might "grab assets themselves ... or precipitate bankruptcy at the smallest sign of trouble, hoping to 'catch' inside preferences before it is too late"); *see also In re Kroh Bros. Dev. Co.*, 115 B.R. 1011, 1015 (Bankr.W.D.Mo.1990).

## B. *The Scope of the Deprizio Rule*

The proper interpretation and accommodation of sections 547(b) and 550(a) presents an issue of first impression in the First Circuit. The *Deprizio* rule represents a radical departure from pre-Bankruptcy Code practice.[9] Under *Dean v. Davis*, 242 U.S. 438, 443, 37 S.Ct. 130, 131, 61 L.Ed. 419 (1917), and Bankruptcy Act § 60, 11 U.S.C. § 96, the trustee in bankruptcy could recover a preferential transfer only from an entity in whose hands it represented a "preference" within the terms of the preference avoidance section itself. *See supra* note 7. The *Deprizio* rule has been adopted by the three courts of appeals which have addressed the trilateral preference problem,[10] even though many lower

knowledge of the voidability of the transfer avoided; or
(2) any immediate or mediate good faith transferee of such transferee.
11 U.S.C. § 550 (emphasis added).

**9.** As the *Deprizio* court acknowledged, "there is no helpful legislative history" to inform the inherent ambiguity in Bankruptcy Code § 550, and no mention in the legislative record that Congress ever even considered abandoning the longstanding rule in *Dean v. Davis, infra. See Deprizio*, 874 F.2d at 1196.

**10.** These courts of appeals endorse *Deprizio's* reliance on the "plain language" of the statute. *See In re C–L Cartage Co.*, 899 F.2d 1490 (6th Cir.1990); *In re Robinson Bros. Drilling, Inc.*, 97 B.R. 77 (W.D.Okla.1988), *aff'd*, 892 F.2d 850

courts have rejected *Deprizio* on a variety of grounds.

Discerning no indication in the legislative history of Bankruptcy Code 550(a), 11 U.S.C. § 550(a), that Congress ever considered the trilateral preference problem, some bankruptcy courts have relied on their "equitable powers" to override whatever "plain" statutory language might be perceived to require the *Deprizio* approach, so as not to penalize an "innocent" non-insider "for its prudence in seeking a guarantor of the debt." *In re R.A. Beck Builder, Inc.,* 34 B.R. 888, 894 (Bankr.W.D.Pa. 1983); *see also In re Arundel Hous. Components, Inc.,* 126 B.R. 216 (Bankr.D.Md. 1991); *In re Aerco Metals, Inc.,* 60 B.R. 77 (Bankr.N.D.Tex.1985); *In re Cove Patio Corp.,* 19 B.R. 843 (Bankr.S.D.Fla.1982). Other courts have adopted a theoretical "two-transfer" analysis, which treats a single transfer within the one-year preference period as both a direct transfer to the non-insider creditor and an indirect "transfer" benefitting the insider creditor, thereby permitting the trustee to recover only the latter "transfer" from the preferred insider. *See, e.g., In re Mercon Indus., Inc.,* 37 B.R. 549 (Bankr.E.D.Pa.1984) ("[T]he Code dictates that there are two transfers rather than one, [and] liability of the guarantors under § 547(b) need not be predicated on a finding of an avoidable transfer to [the non-insider creditor], since a finding of liability on one transfer is independent of the other, rather than derivative."). Other courts hold that sections 550(a) and 547(b) are better harmonized by subordinating the more general statutory language in section 550(a) to the *specific* language in section 547(b)(4), prescribing separate preference periods for application to insider and non-insider transfers. *See In re Midwestern Cos.,* 102 B.R. 169 (W.D.Mo.1989) (*Deprizio* interpretation effectively obliterates specific distinction in § 547(b)(4) between insider and non-insider creditors);[11] *see also In re Performance Communications, Inc.,* 126 B.R. 473 (Bankr.W.D.Pa.1991). Finally, some other courts reject the *Deprizio* rule simply on policy grounds by reason of its presumed detrimental effects on commercial lending markets. *See In re Rubin Bros. Footwear, Inc.,* 119 B.R. 416, 425 (S.D.N.Y.1990) (*Deprizio* rule "would likely impede the availability of credit to ailing businesses.").

We need not revisit the underlying issue addressed in *Deprizio*. First, the difficulties hampering each attempt (including *Deprizio*) to unravel the riddle of ill-expressed (or unexpressed) congressional intent are well recorded.[12] Second, a definitive congressional resolution to the riddle may be in the offing. *See* S.1985, 102d Cong., 2d Sess. (1992); *see also* 138 Cong. Rec. S8241 ("[S]ection [204] seeks to overturn the *Deprizio* line of opinions....").

(10th Cir.1989). *See also, e.g., In re Installation Servs., Inc.,* 101 B.R. 282 (Bankr.N.D.Ala.1989); *In re Coastal Petroleum Corp.,* 91 B.R. 35 (Bankr.N.D.Ohio 1988); *In re W.E. Tucker Oil, Inc.,* 42 B.R. 897 (Bankr.W.D.Ark.1984); *In re Big Three Transport, Inc.,* 41 B.R. 16 (Bankr. W.D.Ark.1983).

**11.** Although the *Midwestern* critique may be sound in the trilateral preference context, § 547(b)(4) would continue to prescribe the applicable *bilateral* preference period.

**12.** *See, e.g., Deprizio,* 874 F.2d at 1195–96 (two-transfer approach misinterprets "transfer," which is defined in § 101(54) as viewed from the *debtor's* perspective ("every mode ... of *disposing* of or parting with property"), not from the transferee's perspective (as separate "benefit received")); *Coastal Petroleum,* 91 B.R. at 37 (bankruptcy courts are not at liberty to employ general equitable powers to disregard Bankruptcy Code language, nor is it necessarily "inequitable" to penalize a non-insider creditor who bargained for the protections afforded by a guaranty); Henk J. Brands, *The Interplay Between Sections 547(b) and 550 of the Bankruptcy Code,* 89 Colum.L.Rev. 530, 542–46 (1989) (and cases cited therein) (*Deprizio* rule flawed, as pre-Code practice recognized no such expansive recovery rights and legislative history of Code § 550 offers no conclusive evidence of specific congressional intent to depart from pre-Code practice); Jay L. Westbrook, *Two Thoughts About Insider Preferences,* 76 Minn.L.Rev. 80–86 (1991) (and cases cited therein) (policy-based approach flawed, as *Deprizio* rule actually discourages only those guaranties utilized by creditors for the *sole* purpose of gaining improper leverage over insider, not guarantees legitimately obtained from a guarantor creditworthy in his own right; if trustee recovers preference in latter situation, the creditor can simply recover it from solvent guarantor). Although none of these critiques is without its own shortcomings, it is not necessary to delve into them here.

Finally, and more importantly, the particular circumstances before us afford a more conspicuous basis for decision. Therefore, for present purposes, we assume, without deciding, that *Deprizio* correctly interprets the legislative directives to be applied to the present claim.

*Deprizio* did not propound a *per se* rule enabling the recovery of every temporally vulnerable transfer to a non-insider merely because its claim against the debtor is guaranteed by an insider. *See Deprizio*, 874 F.2d at 1199 ("§ 547(b)(5) and (c) ... [will] exclude from recovery the bulk of ordinary commercial payments.") Even under *Deprizio*, the trustee is not entitled to recover without first establishing, by a preponderance of the evidence, all five elements of a preference as set forth in section 547(b). Bankruptcy Code § 547(g), 11 U.S.C. § 547(g); *In re T.B. Westex Foods, Inc.*, 950 F.2d 1187, 1190 (5th Cir.1992). In the present case, therefore, the one-year preference period under section 547(b)(4) will not apply unless the *trustee* can demonstrate that it was Murray, the only "creditor" who was also an "insider," *see* § 547(b)(5) ("that enables *such* creditor") (emphasis added), who received not only a cognizable "benefit" from the challenged transfers, *see* 11 U.S.C. § 547(b)(1), but a greater benefit than would have been received in the event Erin had been liquidated under chapter 7, *see* 11 U.S.C. § 547(b)(5). *See In re C–L Cartage*, 899 F.2d at 1493.

■ The trustee contends that Murray received at least two types of "benefit" from Erin's interest payments to the secured lenders: (1) whatever unquantifiable benefit Murray realized as a consequence of the resultant one-year delay in the commencement of involuntary chapter 11 proceedings against Erin, which in turn (i) insulated Murray from more immediate foreclosure proceedings against the collateral pledged to support his non-recourse personal guaranty of Erin's debt to the secured lenders, (ii) preserved his equity in the pledged collateral, and (iii) "bought" valuable operating time in which Erin could try to work its way out of insolvency, and (2) the quantifiable dollar-for-dollar reduction in his contingent liability to the secured lenders on the non-recourse personal guaranty.

1. Delay in Commencement of the Erin Involuntary Chapter 11 Proceedings

■ The determination as to what constitutes a cognizable "benefit" within the meaning of Bankruptcy Code § 547(b)(1) is an issue of statutory interpretation, a question of law subject to *de novo* review. *See In re LaRoche*, 969 F.2d 1299, 1301 (1st Cir.1992) (standard of review in bankruptcy cases); *In re Crouthamel Potato Chip Co.*, 786 F.2d 141, 144 (3d Cir.1986) (interpretation of terms in Bankruptcy Code is a question of law subject to plenary appellate review). The bankruptcy court apparently accepted the trustee's position, as it found that Murray derived unquantified "benefit" from the challenged transfers. *Erin Food*, 117 B.R. at 29 ("[T]he larger obligation of Murray's Burger King property has to protect the greater, his likelihood of ultimate liquidation or smaller, his recovery of those assets."). Nevertheless, we are unpersuaded that whatever unquantifiable "insider" advantage may attend a deferral of bankruptcy proceedings represents a cognizable "benefit" for section 547(b)(1) purposes. No matter the merits of the *Deprizio* rule, there is no hint in the Code, its legislative history, or in pre-Code law that Congress ever considered, let alone intended, that the term "benefit" might encompass such incorporeal ephemera as "buying time."[13]

---

**13.** An additional flaw in the argument advanced by the trustee, aside from the absence of authority, is that the expansive definition of "benefit," (*e.g.*, "buying time" or the extended opportunity to operate the debtor's business) is at odds with the limited goals of section 547(b), which was never designed to undo every insider transaction which might result in some prepetition diminution of the debtor estate. For example, many transfers to holders of antecedent debts as a consequence of which an insider derives a clear "benefit" would not be subject to avoidance under § 547(b) unless the insider was a "creditor" of the debtor estate who was collaterally obligated on the same obligation owed by the debtor. *See, e.g., Deprizio*, 874 F.2d at 1191–94 (tax payments and pension plan payments not recoverable where no insider was liable with debtor on antecedent debt). Similarly, if an insider and a non-insider creditor acted with

■ The trustee relies on alleged ambiguity in the language of section 547(b)—in particular, the terms "benefit" and "received more"—to support the contention that some intangible benefit, even if unrelated to actual variations in the dollar amount of the insider creditor's hypothetical chapter 7 "claim," may suffice to establish a voidable preference. When confronted with an alleged ambiguity in the Bankruptcy Code, courts may consult pre-Code law for appropriate guidance, based on the presumption that Congress did not intend to effect substantive changes in prior bankruptcy law unless its intent is clearly expressed in the Code. *See Midlantic Nat'l Bank v. New Jersey Dept. of Envtl. Protection*, 474 U.S. 494, 501, 106 S.Ct. 755, 759, 88 L.Ed.2d 859 (1986). Section 60(a)(1) of the Bankruptcy Act provided, in pertinent part:

> A preference is a transfer, as defined in this title, of any property of a debtor *to or for the benefit of a creditor* for or on account of an antecedent debt .... *the effect of which transfer will be to enable such creditor to obtain a greater percentage of his debt than some other creditor of the same class.*

(Emphasis added.) Thus, the immediate forerunner of the term "received more" is found in the definitive phrase "greater percentage of his [*i.e.*, the creditor's] debt." Under the Bankruptcy Act, there was a direct *pro tanto* correlation between the amount of "benefit" and the dollar amount of the reduction in the creditor's claim. *See, e.g., Kapela v. Newman*, 649 F.2d 887, 890 (1st Cir.1981) ("greater percentage" test refers to insider guarantors' "*'contingent debt'* for repayment of their payment on the guaranty," and noting that the insiders were "*benefitted* as guarantors *by a reduction in the amount due on the [debtor's] Loan*") (emphasis added). Assuming *arguendo* that the language of Bankruptcy Code § 547(b) is more ambiguous than Bankruptcy Act § 60, the legisla-

tive history of the Bankruptcy Code makes clear that Congress never intended to alter the focus of the preference avoidance section in any respect relevant to the present discussion. *See, e.g.*, H.R.Rep. No. 595, 95th Cong., 1st Sess. 372 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5787, 5873 (under both Bankruptcy Act § 60 and Bankruptcy Code § 547(b), "the court must focus on ... the amount that will be received by the members of the class *of which the preferee is a member,*" and "the transfer must enable *the creditor* to whom or for whose benefit it was made to receive a *greater percentage of his claim* than he would have received under the distributive provisions of the bankruptcy code.") (emphasis added); *see generally* 3 James W. Moore, *Collier on Bankruptcy* ¶ 60.34 at 902 (14th ed. 1977).

Construed in unison, subsections 547(b)(1), (2), (4), and (5), harmoniously accommodate the identical direct correlation between the creditor "benefit" addressed in subsection 547(b)(1) and the informing language in subsection 547(b)(5) which requires the trustee to demonstrate that the challenged transfer enabled the creditor to "receive more" than he would have received on the same claim in a chapter 7 liquidation case. Under subsections 547(b)(1) and (2), the challenged transfer must have been made for the benefit of the "creditor" "on account of an antecedent debt"; and for present purposes the relevant antecedent "debt" identified in subsection 547(b)(5)(C) would be the claim on which Murray would have been entitled to "receive[ ] payment" from Erin's chapter 7 estate.

■ The equation could not be more clear. Unless the creditor for whose "benefit" the transfer was made, *see* 11 U.S.C. § 547(b)(1), realized some *quantifiable monetary advantage* from the debtor's transfer, there would be no practicable

---

"intent to hinder, delay, or defraud" creditors of the estate, the debtor transfers thus occasioned within one year of bankruptcy would be avoidable as fraudulent conveyances, not as voidable preferences. *See* Bankruptcy Code § 548; *cf. In re T.B. Westex Foods*, 950 F.2d at 1194 (subjec-

tive intent of parties to preferential transfer irrelevant for § 547(b) purposes); *see generally* John S. Cullina, *Recharacterizing Insider Preferences as Fraudulent Conveyances: A Different View of Levit v. Ingersoll Rand*, 77 Va.L.Rev. 149 (1991).

method for determining whether "such creditor ... receive[d] more than such creditor would receive" in the event of a chapter 7 liquidation, 11 U.S.C. § 547(b)(5). Thus, interpreting all its parts harmoniously, as we must, see, e.g., McCuin v. Secretary of Health and Human Servs., 817 F.2d 161, 168 (1st Cir.1987), we believe section 547(b) plainly mandates that the "benefit" inquiry under section 547(b)(1) be confined, as in Deprizio and every other trilateral preference case, see supra notes 10–12 and accompanying text (and cases cited therein), to transfers of the debtor's property which are shown to have resulted in a quantifiable monetary reduction in the insider-creditor's contingent claim against the debtor's chapter 7 estate to the detriment of other creditors of the same class.[14]

### 2. Reduction in Contingent Liability on Non-recourse Personal Guaranty

■ We return to the question with which we began: whether the interest payments Erin made to the secured lenders reduced the amount of Murray's contingent claim against Erin. Whether a creditor has received a quantifiable "benefit" from the challenged transfer for purposes of section 547(b), and whether that "benefit" exceeds

the amount receivable in a hypothetical liquidation proceeding, are questions of fact. See In re V.N. Deprizio Constr. Co., 86 B.R. 545, 553 (N.D.Ill.1988), rev'd on other grounds sub nom., Levit v. Ingersoll Rand Fin. Corp., 874 F.2d 1186 (7th Cir. 1989); see also Max Sugarman Funeral Home v. A.D.B. Investors, 926 F.2d 1248, 1255 (1st Cir.1991) (findings of fact by the bankruptcy court will be disturbed only if clearly erroneous). While we may affirm the bankruptcy court ruling on any ground supported by the record, see Hemingway, 954 F.2d at 9; the trustee must point to competent evidence from which the bankruptcy court could have adduced the essential findings of fact underlying its ruling.

■ Since the non-insider creditor in a trilateral preference receives direct payment on its antecedent debt, the insider guarantor will realize a corresponding dollar-for-dollar reduction in the amount of his contingent liability on the guarantee, see, e.g., Kapela v. Newman, 649 F.2d at 890 n. 3, except in cases like the present where the insider has guaranteed less than the full amount of the primary debt, or where the primary debt is fully secured by property of the debtor at the time of the challenged transfer.[15]

**14.** Even from a policy standpoint, we do not suppose that Congress envisioned that a trustee's burden would be met by evidence of such an elusive "benefit," the recognition of which would have the effect of converting the Deprizio formulation into an absolute rule of law. The preference rules in § 547(b) ultimately are concerned with fostering equality of treatment among creditors of the same class. The goal of equality is frustrated when one creditor receives a preferential payment at the expense of other creditors of the same class. Of course, all creditors benefit if the debtor can defer and ultimately avoid bankruptcy, and Murray, as an inside creditor, would receive no more benefit, qua creditor, from a deferral of Erin's bankruptcy than would other Erin creditors. As a general rule, therefore, insider conduct which "buys time" for the insider will be indistinguishable from actions designed to "buy time" for the debtor and its creditors. Bankruptcy law should not discourage bona fide efforts to save the debtor. Moreover, assuming that Erin's interest payments incidentally prevented immediate foreclosure against the real estate parcels upon which Erin operated its restaurants, and in turn protected Murray's long-term reversionary rights to those properties under his Master

Lease with Erin, see supra note 2, the interest payments simultaneously benefitted all Erin creditors by delaying foreclosure on the essential "cash flow" assets (equipment, franchise agreements) in Erin's ACP. We conclude that the delaying effect of an allegedly preferential transfer, standing alone and without proof of any direct reduction in the insider's exposure on the guaranty, does not establish cognizable "benefit" within the meaning of § 547(b)(1).

**15.** If the non-insider creditor holds collateral of the debtor sufficient to secure the antecedent debt in full at the time of the transfer, payment on the primary debt produces no cognizable "benefit" to the guarantor, whether or not an insider, since the insider has no exposure on the debt at the time of the transfer. Deprizio, 874 F.2d at 1199–1200; In re Kroh Bros. Dev. Co., 115 B.R. at 1018. Of course the available collateral must be of sufficient value to cover the entire antecedent debt at the time of the transfer. See In re Gamest, Inc., 129 B.R. 179, 182 (Bankr.D.Minn.1991). Significantly, the test turns on the value of the collateral in existence at the time of the challenged transfer, and does not take into account future contingencies which might increase or decrease its value. See infra note 17.

Although the secured lenders realized the full "benefit" of the $2.8 million received in interest payments, there was no reduction whatever in Murray's liability on the non-recourse guaranty. The evidence at trial established the value of the collateral securing Murray's non-recourse guaranty at $19.35 million. Since the personal guaranty was "without recourse" at the time the interest payments were made,[16] Murray had no contingent liability to the secured lenders on Erin's $61.7 million debt, beyond the $19.35 million in collateral Murray pledged to secure the guaranty.[17] Unless the net balance on Erin's $61,741,-000 debt to the secured lenders fell *below* $19.35 million as a result of the challenged transfers, or the value of the ACP *exceeded* $42.39 million at the time of the transfers, no cognizable "benefit" could accrue to Murray. The former proposition cannot be established solely on the basis of a loan payment of $2.08 million, and the trustee did not assert or establish the latter proposition. Accordingly, Murray's exposure on the entire $19.35 million in collateral securing the guaranty remained constant throughout, unaffected by the challenged loan payments to the secured lenders. *Cf. Kroh Bros.*, 115 B.R. at 1016 (where the non-insider creditor "agreed to look exclusively to the shopping center property in the event of default," the "insider" non-recourse guarantor was not even a "creditor" of the debtor).[18]

As the trustee did not show that the challenged transfers from Erin to the secured lenders resulted in a cognizable "benefit" to Murray, the trustee failed, *a fortiori*, to establish that the challenged transfers enabled Murray to receive more than he would receive on his claim in a case under chapter 7. *See* Bankruptcy Code § 547(b)(5), 11 U.S.C. § 547(b)(5). The bankruptcy court is required to *compare* the monetary benefit the creditor in fact received from the alleged preferential

---

**16.** The trustee argues that Murray's personal guaranty was "with recourse" by virtue of the following provision: "Provided, that the foregoing limitations shall not apply with respect to any claim based on fraud, misrepresentation or gross negligence." The trustee asserts that Murray could have been liable for fraud if, contrary to his representations to the secured lenders, he used the RCA advances for purposes other than the interest payments. We disagree. Insofar as the quoted provision might have exposed Murray to greater personal liability, there is no evidence that a triggering contingency ever occurred.

**17.** The trustee further argues that Murray was *potentially* liable for the entire $61,741,000 debt Erin owed the secured lenders, even though his total *actual* exposure on the guaranty at the time of the three interest payments was only $19.35 million—the value of his pledged collateral. The trustee says that this greater potential liability could be triggered by either of two contingencies: (1) substantial future *increases* in the value of the collateral securing the guaranty would commensurately enlarge Murray's total exposure on the non-recourse guaranty; or (2) large future *decreases* in the value of the ACP securing Erin's debt would increase the risk that the secured lenders would look to the collateral supporting Murray's guaranty. This argument too is flawed.

To determine whether a transfer constitutes an avoidable "preference" under § 547(b), "it is the *effect* of the transaction ... that is controlling." 4 *Collier*, ¶ 547.01, at 547–13. It is not enough that the trustee show that the value of the pledged collateral might have fluctuated during the ensuing period prior to bankruptcy. Moreover, the trustee presented no evidence that the value of any collateral securing either Erin's debt or Murray's guaranty fluctuated during the year before bankruptcy. Indeed, given the total amount of the challenged transfers ($2.8 million) in relation to the overall debt obligation ($61,741,000), the trustee would be hard put to assert a plausible claim that Murray mounted any effective effort to regain the collateral or enhance his equity in it. *See Kroh Bros.*, 115 B.R. at 1018 (mere interest payments do not build equity in property).

**18.** Not only did the trustee produce no evidence that Murray benefitted by any reduction in exposure on his personal guaranty, other record evidence indicates that Murray may have *increased* the risk to his pledged collateral when Erin borrowed *more* money from its RCA ($3,249,990) than it subsequently paid the secured lenders in interest payments ($2,808,290). Since the RCA also was secured by Murray's non-recourse guaranty, RCA advances to Erin made it *more* likely, not less likely, that Murray's collateral would be needed to satisfy the secured lenders' claims. While it is conceivable that Murray actually may have received a *net* benefit from the overall transaction, however, the trustee has not established it. The record discloses only that Erin fell further into debt (from approximately $61.35 to $61.9 million) by utilizing RCA advances to pay interest to the secured lenders.

transfer *with* the projected amount of any distribution *to* the same creditor in the event there were an order for relief under chapter 7 and the preferential transfer had never occurred. *See, e.g., In re Tenna Corp.,* 801 F.2d 819, 822 (6th Cir.1986) (hypothetical chapter 7 distribution constructed as of date of petition, not the date of the proceeding to avoid the transfer); *In re Buyer's Club Markets, Inc.,* 123 B.R. 895, 896–97 (Bankr.D.Colo.1991) (same); *cf. Palmer Clay Prods. Co. v. Brown,* 297 U.S. 227, 229, 56 S.Ct. 450, 450–51, 80 L.Ed. 655 (1936) (pre-Code rule the same). Even if the defendant-creditor does derive a cognizable "benefit," the transfer is avoidable only if it " 'diminish[ed] the fund to which creditors *of the same class* [as the defendant-creditor] can legally resort for the payment of their debts.' " *Kapela,* 649 F.2d at 892 (emphasis added) (citation omitted). Transfers to a fully-secured creditor, for example, are not avoidable as preferences, since the secured claim would be satisfied in full in a chapter 7 liquidation.

*See Deprizio,* 874 F.2d at 1199–1200. Except in the unusual circumstance where a debtor's estate is adequate to provide payment in full on all unsecured claims, unsecured creditors who receive payment during the applicable preference period will rarely be spared by section 547(b)(5). *See, e.g., In re Cavalier Homes of Georgia, Inc.,* 102 B.R. 878, 888 (Bankr.M.D.Ga. 1989).

■ Thus, the subsection 547(b)(5) analysis adopted by the bankruptcy court was flawed at the outset as a consequence of its mistaken interpretation of subsection 547(b)(1) ("to or for the *benefit* of a creditor") (emphasis added). *See supra* notes 13–14 and accompanying text. If Erin had not made the three interest payments, Murray would have held a contingent unsecured claim against the debtor estate in the amount of $19.35 million; immediately after the challenged transfers, Murray held a contingent unsecured claim in the same amount.[19] As the trustee failed to sustain

---

**19.** The bankruptcy court concluded that Murray had realized greater benefit from the three interest payments than would have been received in a chapter 7 distribution since the transfers were a "dollar-for-dollar payment while debtor was insolvent based on this now [*i.e.,* secured lenders'] *undersecured* claim. *Erin Food,* 117 B.R. at 30 (emphasis added). The trustee apparently propounds this as an alternative justification for the bankruptcy court's ruling, citing *In re Gamest, Inc.,* 129 B.R. at 182 (quoting *Deprizio,* 874 F.2d at 1199–1200) (emphasis added).

> [U]nder § 547(b)(5) a transfer is avoidable only to the extent the creditor [*i.e.,* the insider guarantor] received more than it would have in a Chapter 7 liquidation. A fully-secured creditor [*i.e.,* the inside guarantor *asserting right of subrogation* ] will be paid in full under Chapter 7, so there is no voidable preference in this case with or without a guarantee by an insider.

*See* Brief for Appellee at 27. The trustee correctly notes that the *secured lenders* did receive more from Erin's prepetition interest payments than they would have received in a chapter 7 liquidation on their partially secured claim, since only *fully* secured creditors would have received full satisfaction in a chapter 7 distribution. The trustee contends that Murray, as subrogee to the secured lenders, likewise received "more" from Erin's interest payments than he could recover in a chapter 7 case: "Not only is the 'creditor' the same, but so is the debt, and the debt referred to is the *Secured Lender's debt,*

to which the guarantor is *constructively subrogated."* (Emphasis added).

Once again we must disagree. As a guarantor, Murray would have an option in a chapter 7 case. Once Murray surrendered the collateral securing his guaranty, *see* Bankruptcy Code § 509(c), he could either assert his own *unsecured* claim for reimbursement and contribution, *see* Bankruptcy Code § 502(e)(1)(B), (2), or rely on his right of subrogation to the secured lenders' *partially secured* claim against the debtor estate, *see* Bankruptcy Code §§ 502(e)(1)(C), 509(a) ("[A]n entity that is liable with the debtor on, *or that has secured,* a claim of a creditor against the debtor, and that pays such claim, is subrogated to the rights of such creditor to the extent of such payment.") (emphasis added). Under § 509, Murray "secured" Erin's debt by pledging his collateral to secure the non-recourse guaranty. *See In re Kaiser Steel Corp.,* 89 B.R. 150, 154 (Bankr.D.Colo.1988).

Even if Murray had made such an election under § 509(a), however, subrogation would not have had the effect of ascribing to Murray the "benefit" received by the secured lenders. Under § 509(a), Murray simply would be "subrogated to the *rights* of such creditor to the extent of [Murray's] payment," which rights would include the rights to priority distribution, or secured status to which the subrogor's claim was entitled. (Emphasis added.) *See In re Wingspread Corp.,* 116 B.R. 915, 930–31 (Bankr. S.D.N.Y.1990) (priority attaches to claim, not to creditor or claimant). Subrogation would merely convert Murray's $19.35 million unsecured claim for reimbursement into a partially

his burden of proof under subsection 547(b), we do not reach the secured lenders' challenge to the disallowance of their "ordinary course of business" defense under Bankruptcy Code § 547(c)(2).

*The district court judgment affirming the decision of the bankruptcy court is reversed, costs to appellants.*

secured claim, which would not have been entitled to full payment in any chapter 7 distribu-

