In re PARIS INDUSTRIES CORPORA-
TION, Vitro Agate Corporation, Otselic
Enterprises, Inc., Stylecrafters Corpo-
ration and Gladding Cordage Corpora-
tion, Debtors.

Stephen S. GRAY, Chapter
11 Trustee, Plaintiff,

v.

A.I. CREDIT CORPORATION, Defendant.

Bankruptcy Nos. 87–20111 to 87–20115.
Adv. No. 88–2090.

United States Bankruptcy Court,
D. Maine.

July 17, 1991.

See also 106 B.R. 344.

Herbert Weinberg, Kaye, Fialkow, Rich-
mond & Rothstein, Boston, Mass., for plain-
tiff, trustee.

James E. Grumbach, Serino, Vernaglia,
Ley & Young, Boston, Mass., for defen-
dant.

DECISION AND ORDER

ARTHUR N. VOTOLATO, Jr.,
Bankruptcy Judge.*

Before the Court is the Complaint of
Stephen S. Gray, the Chapter 11 Trustee of
Paris Industries Corporation (Paris), who
seeks to recover two payments, totalling
$21,125, as preferential transfers made by
Paris to the Defendant A.I. Credit Corpora-
tion (AIC). The matter has been submitted
on briefs.[1]

In *Drabkin v. A.I. Credit Corp.,* 800
F.2d 1153 (D.C.Cir.1986), a case involving
similar facts, in which this same defendant
found itself resisting a trustee's preference
action, the District of Columbia Court of
Appeals aptly described how AIC conducts
its business:

AIC is a premium financing company.
Its business is to lend money usually to
commercial enterprises, to enable the

---

* Of the District of Rhode Island, sitting by desig-
nation.

1. But they were not particularly helpful to the
Court in addressing the issues that we feel are
dispositive.

borrower to purchase insurance. Premium financing is a common commercial arrangement. *See, e.g., In re Duke Roofing,* 47 B.R. 990, 994 (E.D.Mich. 1985). As collateral for the loan, the finance company takes a security interest in the unearned premiums. It retains the right to cancel the policy in the event of nonpayment and to claim the remaining unearned premiums under the terms of the policy. This kind of security interest is predicated on the fact that although an insurance policy covering a long period into the future may be paid for in advance, the insurer earns the premiums only as each "daily unit" of insurance is extended to the insured. Thus, on any given day during the term of an insurance policy, there is a fund of unearned premiums which must be refunded upon cancellation of the coverage. Obviously, the fund diminishes with time as the insurer earns the premiums.

*Id.* at 1154. The foregoing summary of AIC's operating procedures is sufficiently similar to AIC's operation in the instant proceeding for use herein as our own.

## BACKGROUND

The parties have stipulated as follows:

On July 18, 1986, Paris borrowed $133,779 from AIC to pay the annual premiums for five of its business related insurance policies. In return, Paris agreed to make an initial payment of $52,684, followed by eight monthly installments of $10,560 each, with the last payment due on February 12, 1987, giving AIC a $3,385 profit for the use of its money for eight months.

From its inception, and throughout the eight month term of the loan, Paris consistently made its payments late, ranging between 22 to 26 days after the due date. As a result of Paris' tardiness, each and every month AIC mailed Paris a "Notice of Intent to Cancel." On February 3, 1987, 66 days before Paris filed its bankruptcy petition, AIC received a $10,565 payment, 22 days late. On March 9, 1987, 25 days after the due date and 30 days prior to the petition, Paris made its last payment, which

was received by AIC within hours after AIC had actually mailed a "Notice of Cancellation" to Paris' five insurance carriers. Immediately upon receipt of that payment, however, AIC reversed itself and sent a "Request for Reinstatement" form to each carrier.

On April 10, 1987, Paris filed the instant petition, and shortly thereafter Stephen S. Gray was appointed Chapter 11 Trustee. Gray seeks to recover the last two installment payments, made on February 3, 1987 and March 10, 1987, respectively, both within 90 days of Paris' Chapter 11 filing.

## THE PREFERENCE ACTION

The Trustee must prove each of the five elements in § 547(b) to establish a payment as preferential. *See Barash v. Public Finance Corp.,* 658 F.2d 504, 507 (7th Cir. 1981). Section 547(b) provides:

the trustee may avoid any transfer of an interest of the debtor in property—

(1) to or for the benefit of a creditor;

(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;

(3) made while the debtor was insolvent;

(4) made—

(A) on or within 90 days before the date of the filing of the petition;

. . . .

(5) that enables such creditor to receive more than such creditor would receive if—

(A) the case were a case under chapter 7 of this title;

(B) the transfer had not been made;

AIC asserts, inter alia, that in this preference action the Debtor has failed to satisfy all the elements of § 547(b), because, it alleges, the last two payments were made for current, as opposed to antecedent, debt. Whether a debt is current or antecedent depends, of course, on when it was incurred, and we conclude as a matter of law that Paris incurred the debt in question on July 18, 1986 when the premium finance agreement was signed, and not, as AIC argues, when each installment pay-

ment became due. *See, e.g., Matter of CHG Intern., Inc.,* 897 F.2d 1479, 1486 (9th Cir.1990) ("A long term borrower receives his lump-sum loan only once and becomes obligated to pay for it at that time though his payments may be spread out over many months"); *Morton Shoe Co. v. Herbert & Boghosian, Inc.,* 36 B.R. 14, 16 (Bankr. D.Mass.1983) (The obligation to pay arises "whenever the debtor obtains a property interest in the consideration exchanged giving rise to the debt. [This occurs] upon performance, delivery, or its equivalent— not when payment is due.") (citations omitted); *In re Western World Funding, Inc.,* 54 B.R. 470 (Bankr.D.Nev.1985) (debt for principle and interest was incurred when the promissory note was signed and the funds transferred to the debtor).

It is clear that the first, third, and fourth elements have also been satisfied, *i.e.:* the relevant payments were made by Paris to AIC for the benefit of a creditor (the first element), while Paris was presumed insolvent (the third element), and within 90 days of the bankruptcy filing (the fourth element). AIC's final § 547(b) argument is whether the two payments in question allowed AIC to obtain more than it would have received in a Chapter 7 distribution (the fifth element). If the value of the collateral (here, the unearned premium fund) fully covered the debt, then AIC did not receive more than it would have received under Chapter 7, because a creditor with a fully secured claim, by definition, receives 100% of the debt owed. *See In re Auto–Train Corp.,* 49 B.R. 605, 610 (D.C.Cir.1985), *aff'd,* 800 F.2d 1153 (D.C.Cir.1986); 3 *Collier on Bankruptcy* ¶ 506.01 (15th ed. 1990). Section 547(b)(5) is satisfied, however, if AIC is deemed an unsecured or undersecured creditor, because such creditors share pro rata in the assets of the estate, to the extent that they are undersecured.

In the present case, some arithmetic is in order since the value of the collateral was decreasing at a fixed rate over a given period of time. For example, on February 3, 1987, when Paris made its next to last payment in the amount of $10,565, there was $35,133 in the unearned premium fund to secure AIC's claim in the amount of $21,125. On March 9, 1987, the date of the last $10,560 payment, there was $22,597 in the unearned premium fund, and AIC was owed $10,560. On April 10, 1987, however, when Paris filed the instant petition, the unearned premium fund contained only $11,118.15, so that as of the date of filing, AIC would have been undersecured *if* the two payments in question had not been made. The dispositive question therefore is: at what point in time should the collateral be valued, to determine whether the creditor is fully secured, for § 547(b)(5) avoidance purposes?

■ We have considered this issue previously, and restate herein that the date of the petition is controlling. *In re Buyer's Club Markets,* 123 B.R. 895, 897 (Bankr. D.Colo.1991); *In re EMB Asso., Inc.,* 100 B.R. 629, 632 (Bankr.D.R.I.1989). Other jurisdictions have ruled similarly. *See, e.g., In re Auto–Train Corp.,* 49 B.R. 605, 609– 10 (D.C.Cir.1985), *aff'd, Drabkin,* 800 F.2d 1153 (D.C.Cir.1986) (a creditor's security interest in refundable unearned insurance premiums, regularly diminishing, is valued, for purposes of § 547(b)(5), as of filing of bankruptcy petition); *In re Property Leasing & Management, Inc.,* 46 B.R. 903, 912 (Bankr. E.D.Tenn.1985) ("the only relevant question is what the secured status of the claim would have been on the date of petition since that alone would determine the distribution to which [the creditor] would have been entitled in a Chapter 7 liquidation").

■ In this case, where unsecured creditors will receive less than 100% of their claims,[2] at least one of the payments in question enabled AIC to receive more than it would have under a Chapter 7 distribution. Without the payments in question, as of the date of bankruptcy, AIC would have held a $10,006.85 unsecured claim, and a secured claim in the amount of $11,118.15. In fact, AIC received a total of $21,125 during the preference period. Accordingly,

---

**2.** It is our understanding that this is a no asset case.

AIC may retain that which was paid on account of the secured claim ($11,118.15), because AIC merely realized the value of its collateral, measured as of the date the petition was filed. "A creditor may retain any payments received during the 90 day period if those payments do not give him a bigger payoff than he would have received if he had waited until bankruptcy to obtain payment." *In re Auto–Train Corp.*, 49 B.R. at 609.[3]

## AIC'S AFFIRMATIVE DEFENSES

Transfers otherwise preferential are not recoverable if a creditor establishes that the questioned transfer falls within one of seven exceptions delineated in § 547(c). *Barash v. Public Finance*, 658 F.2d 504, 507 (7th Cir.1981). *See* H.Rep. No. 95–595, 95th Cong., 1st Sess. 373–374 (1977) U.S.Code Cong. & Admin.News 1978 pp. 5787, 6329, 6330. AIC argues that the payments in question fall within three of the seven § 547(c) exceptions, and are therefore not avoidable.

The three § 547(c) exceptions AIC relies upon provide as follows:

(c) The trustee may not avoid under this section a transfer—

(1) to the extent that such transfer was

(A) intended by the debtor and the creditor ... to be a contemporaneous exchange for new value given to the debtor; and

(B) in fact a substantially contemporaneous exchange;

(2) to the extent that such transfer was—

(A) in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee;

(B) made in the ordinary course of business or financial affairs of the debtor and the transferee; and

(C) made according to ordinary business terms;

. . . .

(4) to or for the benefit of a creditor, to the extent that, after such transfer, such creditor gave new value to or for the benefit of the debtor—

(A) not secured by an otherwise unavoidable security interest; and

(B) on account of which new value the debtor did not make an otherwise unavoidable transfer to or for the benefit of such creditor;

11 U.S.C. § 547(c). AIC argues that the disputed payments are excepted from avoidance under the "contemporaneous exchange of new value" provision, § 547(c)(1), on the ground that it provided new value to the Debtor when it allegedly reinstated Paris' "cancelled insurance" coverage. AIC also contends that the relinquishment of unearned premiums, which AIC says it had a right to collect upon cancellation, constituted new value. AIC also argues that the payments in question are excepted from recovery because AIC's reinstatement of Paris' insurance coverage amounted to new value under § 547(c)(4). Finally, AIC asserts that the Trustee is precluded from recovering said payments because they were made in the ordinary course of Paris' and AIC's business. § 547(c)(2). We reject all three arguments, for the reasons given below.

## NEW VALUE

The stipulated facts, together with the unambiguous language of the premium finance agreement, preclude any argument that Paris' insurance coverage had been cancelled. Although a "Notice of Cancellation" dated January 6, 1987 had been prepared, it was not mailed or otherwise transmitted, because AIC received Paris' payment. *See* stipulations nos. 9 and 12. Sim-

---

**3.** In *Drabkin v. A.I. Credit Corp.*, 800 F.2d 1153, 1157 (D.C.Cir.1986), AIC, an undersecured creditor, argued that there was no 'preference because the payments in question were applied against the secured portion of the debt, and therefore did not put AIC in a better position than it would have occupied in a Chapter 7 liquidation proceeding. The *Drabkin* court rejected this argument and held that payments made during the preference period are presumed to be first credited against the unsecured portion of a debt. We agree with *Drabkin,* and make the same ruling on this issue.

ilarly, the February 3, 1987 payment was received prior to any cancellation. Thereafter, however, on March 9, 1987, AIC did mail a "Notice of Cancellation" to Paris' five insurance carriers, stating that the cancellation would become effective on March 10, 1987 at 12:01 a.m. The premium finance agreement provides "that [AIC] will send a NOTICE OF CANCELLATION to the insurance compan[ies], and to [Paris], cancelling the polic[ies] if [Paris] does not make the payment that is overdue *within the time stated in the NOTICE OF CANCELLATION.*" (emphasis added.) The parties have stipulated that Paris' last payment was received on March 9, 1987, before the deadline set in the "Notice of Cancellation." *See* stipulation no. 9. On these facts, the argument is specious that the two payments in question provided Paris with any new value (insurance coverage).

Finally, it is also misleading to assert that AIC relinquished its security interest in the collateral, and that said relinquishment constituted new value. This argument erroneously assumes that AIC had acquired the right to collect the unearned premiums. Under the premium finance agreement, that right arises *only after* cancellation of the policies. Clearly, none of the five insurance policies was ever cancelled.

## ORDINARY COURSE OF BUSINESS

■ AIC's reliance on the ordinary course of business exception is also misplaced, for the reason that loan payments do not fall within the protection of § 547(c)(2). *See Liningley v. Stuart Shaines, Inc. (In re Acme–Dunham Inc.),* 50 B.R. 734, 741 (D.Me.1985). *In re Acme–Dunham Inc.* is the controlling case in this jurisdiction, and almost every court that has considered the issue has reached the same result. *See, e.g., Matter of CHG*

*Intern., Inc.,* 897 F.2d 1479, 1485 (9th Cir. 1990) (following *Acme–Dunham* ); *WJM, Inc. v. Mass. Dept. of Public Welfare,* 840 F.2d 996, 1011 (1st Cir.1988) (recognizing a consensus among courts and commentators that § 547(c)(2) is limited to excepting "recurring, customary credit transactions" from avoidance by the trustee); *Marathon Oil Company v. Flatau (In re Craig Oil Co.),* 785 F.2d 1563, 1567 (11th Cir.1986) ("The scope of [§ 547(c)(2)'s] protection is necessarily limited to trade credit which is 'kept current' or other transactions which are paid in full within the initial billing cycle"); *In re Bourgeois,* 58 B.R. 657, 660 (Bankr.W.D.La.1986) (following *Acme–Dunham* ).

The rationale for the ordinary course of business exception is well explained by the *Acme–Dunham* court:

> Trade credit transactions are exactly that—a two way exchange. They further the policies of the Code because they allow the debtor to continue on in business and in the narrow context of ongoing trade exchange, they do not diminish the estate for it is replenished by the goods and services paid for. A long-term loan is an antecedent debt in the traditional sense.... [N]othing is exchanged at the time of the payments ... which helps the debtor to continue in business. There is merely an outflow of money from the estate.

*Id.* at 741–42.

The eight month loan term in this case does not distinguish it from the longer loans involved in *Acme–Dunham* and the cases cited above, and the rationale in those cases applies here.[4]

The Court in *McClanahan v. Lakeside National Bank of Lake Charles (In re RDC Corp.),* 88 B.R. 97, 99 (Bankr.W.D.La. 1988), has even extended *Acme–Dunham* and its progeny, holding that payments on

---

**4.** Although a different result was reached in *Fidelity Sav. & Inv. Co. v. New Hope Baptist,* 880 F.2d 1172 (10th Cir.1989), wherein the court held that "the broad language of § 547(c)(2) ... appl[ies] to situations outside of the trade credit arena" and that loan repayments for a term less than one year were protected from the trustee's recovery powers. *Id.* at 1176. The Ninth Circuit criticized this analysis and held that its only support came from the lower court's opinion in *Matter of CHG Intern., Inc.,* 87 B.R. 647, 648 (Bankr.W.D.Wash.1988), which it reversed. *Matter of CHG Intern., Inc.,* 897 F.2d at 1485 n. 11. We follow the majority, and what we consider to be the better reasoned line of cases.

90 day working capital loans, whose maturity had been extended several months, were not transactions within the ordinary course of business exception. *See also Waldschmidt v. Ranier (In re Fulghum Construction Corp.)*, 45 B.R. 112, 116 (Bankr.M.D.Tenn.1984), *aff'd*, 78 B.R. 146 (M.D.Tenn.1987) (preferential payments on six month short term loans were not excepted from avoidance under the ordinary course of business exception found within § 547(c)(2); [5] (" 'Ordinary course' refers to debtor's normal business operation of selling goods or providing services, not borrowing money.") *In re Bourgeois*, 58 B.R. 657, 660 (Bankr.W.D.La.1986).

Based upon all of the foregoing, it is ORDERED that $10,006.85 of the $21,125 paid during the preference period is preferential, and that $11,118.15 may be retained by AIC, since that was a payment on a fully secured claim.

Enter Judgment consistent with this opinion.

**5.** Limiting the scope of § 547(c)(2)'s protection to trade credit transactions consummated within the business billing cycle is consistent with that section's legislative history. Prior to enactment of the 1978 Bankruptcy Code, individual courts had fashioned their own "current expense" rules, to assuage the concerns of trade suppliers. *See Marshall v. Florida Nat'l Bank*, 112 F.2d 380, 382 (5th Cir.1940). Without this judicially created exception, trade suppliers would require cash for goods and services from customers suspected of being distressed, further compounding the problems of an already troubled business which might otherwise be able to survive a temporary cash shortage. Congress codified the "current expense" rule through enactment of § 547(c)(2).