**In re SCHWINN BICYCLE
CO., et al., Debtors.**

**SCHWINN PLAN COMMITTEE,
Plaintiff,**

**v.**

**AFS CYCLE & CO. LTD., et al.
(Transamerica Ins. Fin.
Corp.), Defendants.**

**Bankruptcy Nos. 92 B 22474
to 92 B 22482.
Adv. No. 94 A 01618.**

United States Bankruptcy Court,
N.D. Illinois,
Eastern Division.

May 16, 1995.

Howard Feller and Dion Hayes, McGuire Woods Battle & Boothe, Richmond, VA, Mark Thomas and Terry Horwitz Kass, Katten Muchin & Zavis, Chicago, IL, for plaintiff.

Debra Lee Allen, Transamerica Ins. Finance, Towson, MD, Thomas R. Hill, Rooks Pitts & Poust, Chicago, IL, for defendants.

## *MEMORANDUM OPINION ON MOTION OF DEFENDANT TRANSAMERICA (TIFCO) FOR SUMMARY JUDGMENT*

JACK B. SCHMETTERER, Bankruptcy Judge.

This Adversary proceeding relates to bankruptcy cases filed by Schwinn Bicycle Co. and various related entities (collectively "Debtor" or "Schwinn") under Chapter 11 of the Bankruptcy Code, 11 U.S.C. § 101 *et seq.* Its liquidating Plan was confirmed. On October 3, 1994, Plaintiff Schwinn Plan Committee ("Plaintiff" or "Committee") filed the instant Adversary Complaint against a number of defendants, including Defendant Transamerica Insurance Finance Corporation ("Defendant" or "TIFCO"), as permitted by the confirmed Plan. The Committee alleges as to this Defendant that, within 90 days prior to its filing in bankruptcy, Schwinn made seven payments to TIFCO, totaling $458,876.01, pursuant to terms of two insurance premium financing agreements. The Committee asserts that those payments were preferential transfers, and thus recoverable, under 11 U.S.C. §§ 547 and 550.

TIFCO has moved for summary judgment. TIFCO contends that the payments in question were not preferential because, under 11 U.S.C. § 547(b)(5), those payments did not give TIFCO a greater recovery than would have been available if the payments had not been made and Schwinn had been liquidated under Chapter 7 of the Bankruptcy Code. Specifically, TIFCO asserts that, absent such transfers, it would have immediately foreclosed on its collateral, thereby recovering 100% of its secured claims before Schwinn filed bankruptcy.

For reasons stated herein, TIFCO's Motion for Summary Judgment is by separate order denied.

## UNDISPUTED FACTS

### A. Procedural Background

Schwinn Bicycle Co. was a United States corporation engaged in the business of manufacturing bicycles and bicycle components. Prior to its bankruptcy, Schwinn borrowed funds from Defendant TIFCO to finance insurance premiums on various policies held by Schwinn. The nature of those financing arrangements are discussed in further detail herein.

On October 7, 1992, Schwinn and several related entities (collectively "Debtor" or "Schwinn") filed petitions for relief under Chapter 11 of the Bankruptcy Code. An order was entered on June 6, 1994, confirming Schwinn's Plan of Reorganization. The Schwinn Plan Committee was established pursuant to Article IX of the Plan to perform various tasks involving plan implementation. Pursuant to § 9.2 of the Plan and ¶ 34 of the Confirmation Order, the Committee was authorized to prosecute any proceedings which could be brought on behalf of Debtor or Debtor's estate and to recover any transfers to which Debtor might be entitled under the Bankruptcy Code.

On October 3, 1994, the Committee filed the instant Adversary Complaint against forty-nine pre-petition creditors, including TIFCO, seeking to avoid and recover various alleged preferential transfers under 11 U.S.C. §§ 547(b) and 550. The Committee alleges with respect to this Defendant that Schwinn made seven payments to TIFCO, totalling $458,876.01, pursuant to terms of two insurance premium financing agreements.

### B. Nature of Collateral for Insurance Premium Financing

Insurance premium financing agreements such as the one between Schwinn and TIFCO are commonplace in the insurance industry.[1] Premium financing enables a commercial enterprise to prepay its insurance premiums in full, at the inception of coverage, without having to expend large amounts of cash immediately. In the standard arrangement, the insured pays down roughly 15% to 20% of total premiums due. Keating *Aff.*, ¶ 6. The remaining balance is advanced by the premium finance company.[2] That advance, coupled with the insured's down payment, fully prepays the insured's premiums. In exchange for the premium loan, the insured executes a finance agreement promising to repay the premium finance company the monies advanced, plus finance charges, in amortized monthly installments.

As collateral for the loan, the insured typically assigns to the premium finance company all "return" or "unearned" premiums. Although insurance premiums are typically prepaid at the inception of coverage, the insurer "earns" its premiums on a pro rated basis, earning a small portion of its premium for each day it extends coverage to the insured. Thus, on any given day during the term of an insurance policy, there is an unearned premium balance which would have to be refunded or "returned" to the insured upon cancellation of its coverage. On the inception date of coverage, 100% of prepaid

---

1. Premium financing has been in existence for more than 50 years. Today, it is estimated that more than $10 billion in premiums are financed each year. There are a number of premium finance companies that transact business nationwide, one of which is the Defendant, TIFCO. *See Aff.* of Richard P. Keating, Exec. Dir., Nat'l Group of Ins. Premium Fin. Cos.

2. Insurance premium financing is nearly always arranged by the insured's insurance agent or "producer." The insurance producer typically solicits premium finance companies for terms of financing, prepares the form premium finance agreement required by the chosen finance company, and submits that agreement and other necessary information to the finance company for approval and funding. In most states, the finance company advances the premiums to the insurance producer, who then remits the proper premiums to each of the insured's insurance carriers. *See* Keating *Aff.*, ¶ 9. However, effective September 16, 1992, the Illinois statute was amended to require insurance premium finance companies to advance premiums directly to insurance carriers absent written authority of the carrier to pay the producer. 215 ILCS 5/513a9(b)(2) (1992). Illinois is the only state known to require, by statute, written authorization from the carrier prior to funding an insurance producer.

premiums are unearned. That balance diminishes with time as the insurer gradually earns its premiums. It is these unearned premiums that the insured assigns to the premium finance company as collateral for its loan.

In addition to granting a security interest in its unearned premiums, the insured also typically gives the premium finance company limited power of attorney to cancel the policy in event of default, after notice, and take possession of its collateral. Notices regarding cancellation are generated and mailed in accordance with applicable state law.[3] In Illinois, premium finance companies must first send written notice of their intent to cancel insurance coverage subject to a finance agreement to the insured. The insured then has ten days after receipt of notice to cure its default. If default is not cured within that ten-day grace period, the finance company may effect cancellation by sending notice of cancellation to the insurer. Coverage is then canceled as if the request for cancellation had been submitted by the insured.[4] *See* 215 ILCS 5/513a11 (1992).

### C. Estimating Unearned Premiums

The amount of unearned premiums is finally determined by the insurance carrier only after actual cancellation of insurance coverage. Hence, in order to estimate the value of a premium finance company's collateral (*i.e.*, the value of unearned premiums) on any date during the term of an insurance policy, certain assumptions must be made about the way in which the premium is earned over the term of the insurance contract. The insurance industry typically assumes that premiums are earned on a pro rated basis.

To facilitate calculation of unearned premium balances on any particular date during

the term of the insurance contract, it is customary in the insurance business to use a three-part guide called the "Ronoco Wheel." *See generally* TIFCO *Aff.*, ¶ 23. The Ronoco Wheel, similar in use to slide rulers of days gone by, "calculates" a pro rata ratio given a specific inception date of coverage and hypothetical date of cancellation. The total prepaid premium can then be multiplied by that ratio to produce the total unearned premium as of the hypothetical date of cancellation.

### D. Premium Financing Arrangements Between Schwinn and TIFCO

Prior to filing its Chapter 11 petition on October 7, 1992, Schwinn entered into two of the above-described insurance premium finance agreements with TIFCO. Michael E. McNamara ("McNamara"), then Vice–President/Treasurer of Schwinn, executed the first Premium Finance Agreement with TIFCO on or about March 5, 1992 (the "March Finance Agreement"). Terms of that agreement required TIFCO to advance $922,682.00 to various insurance carriers in order to prepay premiums on policies taken out by Schwinn. In exchange, Schwinn agreed to repay funds advanced, plus finance charges, in nine consecutive monthly installments of $104,827.77 each (totalling $943,499.93), due the first day of each month, beginning April 1, 1992. Schwinn further agreed to assign all unearned premiums to TIFCO and to grant TIFCO limited power of attorney to cancel coverage upon Schwinn's default in payment of the installments due and owing to TIFCO.

On or about July 14, 1992, McNamara executed a second Premium Finance Agreement with TIFCO (the "July Finance Agreement"). Terms of the July Finance Agreement required TIFCO to advance $116,082.00 in premiums on various policies in exchange for nine consecutive monthly installments of

---

3. Insurance premium financing is a state-regulated business. There are currently 38 states plus the United States Virgin Islands that have statutes governing commercial premium finance transactions. The statutes vary from state-to-state, but commonly dictate (i) the contents of the premium finance agreements, (ii) notification procedures to be followed by premium finance companies when canceling coverages under their limited powers of attorney, and (iii) procedural requirements for returning unearned premiums upon default. *See* Keating *Aff.*, ¶ 10.

4. For Illinois insureds, TIFCO mails Notice of Intent to Cancel to the insured and producer five days after default. If default is not cured within the ten-day grace period, TIFCO then mails Notice of Cancellation to the insurance carrier, with copies to the insured and producer, showing the effective date of cancellation to be the day after the mailing date of the Notice of Cancellation. Adding weekend days, the entire cancellation process takes approximately 23 days. TIFCO *Aff.*, ¶ 21.

$13,188.31 each (totalling $118,694.79), due the first day of each month, beginning August 1, 1992. Schwinn again agreed to assign all unearned premiums to TIFCO and to grant TIFCO limited power of attorney to cancel coverage in the event of default.

Alexander & Alexander, Inc. ("A & A") acted as Schwinn's insurance producer in obtaining the insurance coverage scheduled on the March and July Finance Agreements. A & A arranged the financing by obtaining terms for financing from TIFCO, completing the necessary premium finance agreements, and submitting them with supporting information to TIFCO for approval and funding.

### Payment History

On March 26, 1992, pursuant to terms of the March Finance Agreement, TIFCO advanced $922,682.00 to A & A, which, together with Schwinn's down payment of $230,671.00, fully prepaid premiums scheduled in that agreement. An Advice of Financed Premium was mailed on March 13, 1992, to each of the insurance carriers and general agents listed therein, with copies to Schwinn and A & A. TIFCO's records show the pre-petition installments due and owing under the March Finance Agreement to have been received and credited to Schwinn's account as follows:

| Installment Due Date | Amount | Date Received |
|---|---|---|
| 04/01/94 | $104,827.77 | 04/03/92 |
| 05/01/92 | $104,827.77 | 05/04/92 |
| 06/01/92 | $104,827.77 | 06/02/92 |
| 07/01/92 | $104,827.77 | 07/10/92 |
| 08/01/92 | $104,827.77 | 08/10/92 |
| 09/01/92 | $104,827.77 | 09/04/92 |
| 10/01/92 | $104,827.77 | 10/02/92 |
| | $733,794.39 | |

TIFCO Aff., ¶ 11.

On August 7, 1992, pursuant to terms of the July Finance Agreement, TIFCO advanced $116,082.00 to A & A, which, together with Schwinn's down payment of $29,020.00, fully prepaid premiums scheduled in that agreement. An Advice of Financed Premium was mailed on July 17, 1992, to each of the insurance carriers and general agents listed therein, with copies to Schwinn and A & A. TIFCO's records show the pre-petition

installments due and owing under the July Finance Agreement to have been received and credited to Schwinn's account as follows:

| Installment Due Date | Amount | Date Received |
|---|---|---|
| 08/01/92 | $13,188.31 | 08/07/92 |
| 09/01/92 | $13,188.31 | 09/04/92 |
| 10/01/92 | $13,188.31 | 10/01/92 |
| | $39,564.93 | |

TIFCO Aff., ¶ 13.

### The Alleged Preferential Transfers

On October 7, 1992, Schwinn filed its petition for relief under Chapter 11 of the Bankruptcy Code. Accordingly, seven of the installments paid to TIFCO by Schwinn pursuant to terms of the March and July Finance Agreements fell within 90 days of Schwinn's petition date:

| Date Credited to TIFCO Acc't | Installment Amount | Finance Agreement |
|---|---|---|
| 07/10/92 | $104,827.77 | March |
| 08/07/92 | 13,188.31 | July |
| 08/10/92 | 104,827.77 | March |
| 09/04/92 | 104,827.77 | March |
| 09/04/92 | 13,188.31 | July |
| 10/01/92 | 13,188.31 | July |
| 10/02/92 | 104,827.77 | March |
| | $458,876.01 | |

See Compl., Ex. A, p. 12. The foregoing seven payments totalling $458,876.00 comprised transfers by Schwinn of its corporate funds to TIFCO, within 90 days prior to filing bankruptcy, on account of antecedent debts created by the March and July Finance Agreements.

### TIFCO's Actual Recovery

As of the date of filing, TIFCO's claim against Schwinn arising out of the March Finance Agreement was $209,655.54, which was the contract balance then shown on Schwinn's account.[5] The value of TIFCO's collateral (the unearned premium calculated on a pro rata basis as of the bankruptcy petition filing date) using the Ronoco Wheel was $457,881.00 as of the petition date, leaving TIFCO oversecured by $248,225.46. TIFCO filed its Proof of Claim on October 19, 1992, as a secured claim in the amount of $209,655.54.

---

5. Total sums owed by Schwinn to TIFCO under the March Agreement ($104,827.77 × 9 payments = $943,449.93) less total payments received by TIFCO under the March Agreement ($104,927.77 × 7 payments = $733,794.39).

Using the same analysis, TIFCO's claim against Schwinn arising out of the July Finance Agreement was $79,129.86 as of the petition date.[6] The value of TIFCO's collateral (the unearned premium) was $106,070.00 as of the same date, leaving TIFCO oversecured by $26,940.14. TIFCO filed a second Proof of Claim on October 19, 1992, as a secured claim in the amount of $79,129.86.

Post-petition, the insurance coverage scheduled on the March Finance Agreement remained in place. After filing its bankruptcy petition, Schwinn paid the remaining installments due under the March Finance Agreement ($104,827.77 × 2 payments = $209,655.54). Those sums were credited to Schwinn's account as adequate protection payments.[7] TIFCO subsequently withdrew its Proof of Claim related to the March Agreement in March 1993, as the indebtedness on Schwinn's account had been fully satisfied.

Post-petition, Schwinn further paid three of the installments due under the July Finance Agreement, which were also credited to Schwinn's account as adequate protection payments ($13,188.31 × 3 payments = $39,564.93). Schwinn then canceled all insurance coverage scheduled on the July Finance Agreement. Unearned premiums for the canceled policies totalled $68,594.00 as of the date of cancellation, $39,569.93 of which was paid to TIFCO on March 24, 1993, to satisfy the then outstanding indebtedness under the July Finance Agreement (3 remaining payments of $13,188.31). Accordingly, TIFCO further withdrew its Proof of Claim related to the July Agreement in March 1993. Together, the $39,569.93 advanced as adequate protection and the $39,569.93 recovered upon cancellation fully satisfied TIFCO's $79,-129.86 claim arising out of the July Agreement.

### TIFCO's Recovery in Hypothetical Liquidation Under 11 U.S.C. § 547(b)(5)

If the alleged preferential transfers had not been made, TIFCO would have been unsecured under both agreements as of the date Schwinn filed its Chapter 11 petition on October 7, 1992. TIFCO's claim against Schwinn's hypothetical bankruptcy estate in Chapter 7, had the alleged preferential transfers not been made, would have been $628,-966.62 as of the petition date.[8] As noted, according to the Ronoco Wheel, the value of TIFCO's collateral under the March Financing Agreement was $457,881.00 as of the petition date. Thus, if Schwinn had not made the payments at issue under the March Financing Agreement, TIFCO would have had, as of the actual petition date, a secured claim of $457,881.00 and an unsecured claim of $171,085.62 with that Agreement.

Under the July Financing Agreement, again using TIFCO's calculations, TIFCO's claim against Schwinn's hypothetical bankruptcy estate had the contested transfers not been made would have been $118,694.79 as of the petition date.[9] Using the Ronoco Wheel, the value of TIFCO's collateral under the July Agreement was $106,070.00 as of the petition date. Thus, if Schwinn had not made the transfers at issue under the July Financing Agreement as of the petition date, TIFCO would have had a further secured claim pursuant to that Agreement of $106,-070.00 and an unsecured claim of $12,624.79 as of the petition date.

---

**6.** Total sums owed by Schwinn to TIFCO under the July Agreement ($13,188.31 × 9 payments = $118,694.79) less total payments received by TIFCO under the July Agreement ($13,188.31 × 3 payments = $39,364.93).

**7.** As a fully secured creditor, TIFCO was entitled to receive adequate protection for the Debtor's use of its collateral, pursuant to § 363(e) of the Code. *See TIFCO, Inc. v. U.S. Repeating Arms Co. (In re U.S. Repeating Arms Co.)*, 67 B.R. 990 (Bankr.D.Ct.1986). Payments made to TIFCO post-petition are not and have not been in dispute in the Adversary case.

**8.** Total contract balance still owed by Schwinn to TIFCO under the March Agreement ($104,827.77 × 2 payments = $209,655.54) plus total alleged preferential transfers recredited to account ($104,827.77 × 4 payments = $419,311.08).

**9.** Total contract balance still owed under the July Agreement ($13,188.31 × 6 payments = $79,-129.86) plus total contested transfers ($13,188.31 × 3 payments = $39,564.93).

### JURISDICTION

This matter is before the Court pursuant to 28 U.S.C. § 157 and Local General Rule 2.33(A) of the Northern District of Illinois. Subject matter jurisdiction lies under 28 U.S.C. § 1334(b). Venue lies properly under 28 U.S.C. § 1409. This matter constitutes a core proceeding under § 157(b)(2)(B), (C), (F), and (O).

### SUMMARY JUDGMENT STANDARDS

█ Rule 56(c), Federal Rules of Civil Procedure, provides:

> [T]he judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

Fed.R.Civ.P. 56(c) (as applicable per Fed. R.Bankr.P. 7056). *See generally Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249–50, 106 S.Ct. 2505, 2510–11, 91 L.Ed.2d 202 (1986); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 585–87, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986). A court may render summary judgment upon the whole case or only a portion thereof. Fed.R.Civ.P. 56(e). Partial summary judgment is only available, however, where it disposes of at least one count of a complaint in its entirety. *Commonwealth Ins. Co. v. O. Henry Tent & Awning Co.,* 266 F.2d 200, 201 (7th Cir.1959); *Quintana v. Byrd,* 669 F.Supp. 849, 850 (N.D.Ill.1987).

█ The moving party bears the initial burden of demonstrating that no genuine issues of material fact exist and that judgment should be granted in its favor as a matter of law. *Celotex,* 477 U.S. at 322–23, 106 S.Ct. at 2552–53. The movant must inform the court of the basis for its motion and identify those portions of the record which it believes demonstrate the absence of a genuine issue of material fact. *Id.* There is no genuine issue for trial only if the record, taken as a whole, could not lead a rational trier of fact to find for the non-moving party. *Matsushita,* 475 U.S. at 585–87, 106 S.Ct. at 1355–56; *Liberty Lobby, Inc.,* 477 U.S. at 249–50, 106 S.Ct. at 2510–11.

█ Inferences drawn from the underlying facts will be viewed in a light most favorable to the non-moving party. *Anderson,* 477 U.S. at 255, 106 S.Ct. at 2513–14; *Matsushita,* 475 U.S. at 586, 106 S.Ct. at 1355–56. However, the existence of a material factual dispute is sufficient to prevent summary judgment only if the disputed fact is determinative of the outcome under applicable law. *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510.

### DISCUSSION

#### A. 11 U.S.C. § 547(b)(5) Analysis

█ Under the Bankruptcy Code's preference avoidance provision, 11 U.S.C. § 547(b), a trustee may avoid, and ultimately recover for the benefit of the estate, certain transfers made by a debtor to a creditor within the 90 days prior to its filing in bankruptcy.[10] A transfer will only be avoidable as a preference, however, where payment improved the creditor's position vis-a-vis other similarly-situated creditors.[11] In other

---

**10.** The trustee may avoid transfers (1) of an interest of the debtor in property; (2) made to or for the benefit of creditors; (3) for or on account of an antecedent debt; (4) while the debtor was insolvent; (5) made within 90 days of the petition date (one year for creditors who qualify as "insiders" at the time of transfer); and (6) which enable those transferees to receive more than they would have received in a Chapter 7 liquidation. 11 U.S.C. § 547(b); *Matter of Smith,* 966 F.2d 1527, 1529 (7th Cir.), *cert. dismissed, Baker & Schultz v. Boyer,* — U.S. —, 113 S.Ct. 683, 121 L.Ed.2d 604 (1992). The trustee must establish all six elements in order to avoid a transfer. *Barash v. Public Fin. Corp.,* 658 F.2d

504, 507 (7th Cir.1981). As earlier noted, Schwinn transferred corporate funds to TIFCO within ninety days of bankruptcy, while Schwinn was presumed insolvent, 11 U.S.C. § 547(f), on account of antecedent debts created by the March and July Finance Agreements.

**11.** 11 U.S.C. § 547(b)(5); *Barash,* 658 F.2d at 507. Section 547(b)(5) provides that the trustee may avoid any transfer of an interest of the debtor in property:

> (5) that enables such creditor to receive more than such creditor would receive if—
> (A) the case were a case under chapter 7 of this title;

words, for there to have been a voidable preference, the suspicious transfers must have enabled the transferee-creditor to recover more than it would otherwise have been entitled to had the transfer not been made and had the debtor's estate then been liquidated under Chapter 7 of the Bankruptcy Code.

The question whether a given transferee-creditor has been "preferred" under the Bankruptcy Code will turn partly on the nature and extent of that creditor's claim. *See Barash,* 658 F.2d at 507–08; *Gray v. A.I. Credit Corp. (In re Paris Indus. Corp.),* 130 B.R. 1, 3 (Bankr.D.Me.1991); *A.I. Credit Corp. v. Drabkin (In re Auto–Train Corp.),* 49 B.R. 605, 610–11 (Bankr.D.D.C.1985), *aff'd,* 800 F.2d 1153 (D.C.Cir.1986); *In re Zuni,* 6 B.R. 449, 452 (Bankr.D.N.M.1980). On the one hand, a creditor who receives payment attributable to an unsecured claim will usually receive a preference, assuming the other elements of § 547(b) are satisfied, because absent such transfer that creditor would only share pro rata with other holders of allowed unsecured claims in a Chapter 7 distribution. 11 U.S.C. § 726(a)(2); *Knopfler v. Schraiber (In re Schraiber),* 1992 WL 280801 *17 (Bankr.N.D.Ill.1992) (Schmetterer, J.) (and cases cited); *Paris Indus.,* 130 B.R. at 3; *Auto–Train,* 49 B.R. at 610 (*quoting Barash,* 658 F.2d at 508; further citation omitted).

On the other hand, a creditor who receives payment attributable to a secured claim is not usually "preferred" because secured creditors generally receive 100% of the value of their collateral upon distribution in a Chapter 7 case. 11 U.S.C. §§ 506, 724; *Schraiber,* 1992 WL 280801 *17; *Paris Indus.,* 130 B.R. at 3; *Auto–Train,* 49 B.R. at 610. Transfers to a secured creditor within 90 days of bankruptcy do not ordinarily exceed the value of the collateral, and thus do not deplete the debtor's estate or deprive similarly-situated creditors of their fair share of the creditor's collateral, because the secured creditor has an identifiable property interest in its collateral or the proceeds derived from the sale of it. *Id.* By accepting such payments, the secured creditor has usually realized only the value or part of that value of its collateral at an earlier point than it would have had it waited until the debtor filed a bankruptcy proceeding under Chapter 7 of the Code.

There is no doubt here as to the secured nature of TIFCO's claims against Schwinn's various unearned insurance premiums.[12] There is, however, a dispute as to the extent of those secured claims. A transfer is only "preferential," and thus recoverable, *to the extent* the transferee-creditor obtained more than it would have absent such transfer in a hypothetical liquidation. 11 U.S.C. § 550(a); *Levit v. Ingersoll Rand Fin'l Corp.,* 874 F.2d 1186, 1196 (7th Cir.1989) ("*Deprizio*") (and legislative history cited); *Schraiber,* 1992 WL 280801 *16. Thus, it must be determined whether the value of assets pledged as collateral equalled or exceeded the value of the creditor's secured claim as of the times of the questioned payments. If so, the creditor was then fully secured, and thus entitled to 100% of its claim upon liquidation in a Chapter 7 case, and there was no "preference." *See Paris Indus.,* 130 B.R. at 3; *Auto–Train,* 49 B.R. at 610. However, if not, the creditor is undersecured and its claim must be bifurcated into a secured portion and an unsecured portion. 11 U.S.C. § 506(a); *Barash,* 658 F.2d at 507. The undersecured creditor will be deemed to hold a secured claim only to the extent of the value of its collateral. *Id.* Any remaining balance will be deemed an unsecured deficiency claim, *id.,* and would thus

(B) the transfer had not been made; and (C) such creditor received payment of such debt to the extent provided by the provisions of this title.

11 U.S.C. § 547(b)(5) (1994).

**12.** Premium finance companies' security interests are typically characterized as purchase money security interests. *See, e.g., TIFCO, Inc. v. U.S. Repeating Arms (In re U.S. Repeating Arms Co.),* 67 B.R. 990, 997 (Bankr.D.Ct.1986). Courts have uniformly treated premium finance companies as secured creditors, with their security interests exempt from the filing requirements of Article 9 of the Uniform Commercial Code. *See, e.g., Id.* at 996 (and cases cited); *Uly–Pak, Inc. v. Consolidated Ins. Agency, Inc. (In re Uly–Pak, Inc.),* 101 B.R. 551, 553–54 (Bankr.S.D.Ill. 1989).

entitle its holder to share pro rata with other unsecured creditors in a Chapter 7 distribution, 11 U.S.C. § 726(a)(2). Section 547(b)(5) might therefore be satisfied, and TIFCO could in such event have been preferred to the extent it is found to hold an unsecured deficiency claim.

■ Determining whether a secured creditor would have been undersecured in a hypothetical liquidation raises another question: At what point in time should the collateral be valued? As a matter of well-settled law, collateral should be valued for purposes of a hypothetical liquidation under § 547(b)(5) as of the date the bankruptcy petition was filed.[13] In light of the foregoing authority, the Committee does not dispute that the petition filing date controls.

### TIFCO's Actual Recovery

■ Under the March Financing Agreement, as found above, TIFCO has recovered 100% of the sums owed by Schwinn. Prior to Schwinn's filing bankruptcy, TIFCO received seven of nine payments owed by Schwinn, totalling $733,794.39 ($104,827.77 × 7 payments). Post-petition, TIFCO recovered the remaining two payments, totalling $209,655.54, as adequate protection payments. Thus, TIFCO fully recovered the $943,449.93 Schwinn owed TIFCO under the March Agreement.

Under the July Financing Agreement, also as found above, TIFCO further recovered 100% of the sums owed by Schwinn. Pre-

petition, TIFCO received three of nine payments, totalling $39,564.93 ($13,188.31 × 3 payments). Post-petition, TIFCO recovered the remaining $79,129.86 ($13,188.31 × 6 payments), in part as adequate protection payments ($13,188.31 × 3 payments = 39,-564.93), and the remainder out of unearned premiums upon cancellation of the policies in the July Agreement ($39,564.93). Thus, TIFCO fully recovered the $118,694.79 Schwinn owed TIFCO under the July Agreement.

### TIFCO's Recovery in a Hypothetical Liquidation

As noted in the recitation of undisputed facts, TIFCO would have been undersecured under both agreements as of Schwinn's bankruptcy petition date had the alleged preferential transfers not been made. As previously shown under the March Financing Agreement, TIFCO's claim against Schwinn's hypothetical bankruptcy estate in Chapter 7 would have been $628,966.62 as of the petition date had the seven transfers totalling $458,876.00 not been made. Using the Ronoco Wheel to compute unearned premiums, the value of TIFCO's collateral under the March Financing Agreement would have been $457,881.00 as of the same date. Thus, if Schwinn had not made the payments at issue under the March Financing Agreement, TIFCO would have had as of the petition date a secured claim pursuant to that Agreement of $457,881.00 and an unsecured claim of $171,085.62. *See* 11 U.S.C. § 506(a).

---

13. *Schraiber*, 1992 WL 280801 *16; *Sloan v. Zions First Nat'l Bank (In re Castletons)*, 990 F.2d 551, 554–55 (10th Cir.1993); *Alvarado v. Walsh (In re LCO Enters.)*, 12 F.3d 938, 941, 945 (9th Cir.1993); *Taunt v. Fidelity Bank (In re Royal Golf Prods. Corp.)*, 908 F.2d 91, 95 (6th Cir. 1990); *In re Tenna Corp.*, 801 F.2d 819, 822–23 (6th Cir.1986); *First Trust Nat'l Asso. v. American Nat'l Bank & Trust Co. of Chicago (In re Adventist Living Centers, Inc.)*, 174 B.R. 505, 515 (Bankr.N.D.Ill.1994) (Sonderby, J.); *Union Meeting Partners v. Lincoln Nat'l Life Ins. Co. (In re Union Meeting Partners)*, 163 B.R. 229, 237 n. 2 (Bankr.E.D.Pa.1994); *Paris Indus.*, 130 B.R. at 3 (and cases cited); *In re Alper–Richman Furs, Ltd.*, 147 B.R. 140, 155 (Bankr.N.D.Ill.1992) (Katz, J.); *see also* 4 Collier on Bankruptcy ¶ 547.08 at 547–41 (15th ed. 1995); Vern Countryman, *The Concept of a Voidable Preference in Bankruptcy*, 38 Vand.L.Rev. 713, 740–41 (1985).

The legislative history of 11 U.S.C. § 547(b)(5) further supports this conclusion. Section 547(b)(5) was originally intended to be a codification of the holding first announced in *Palmer Clay Prods. Co. v. Brown*, 297 U.S. 227, 56 S.Ct. 450, 80 L.Ed. 655 (U.S.1936). *See* 4 Collier on Bankruptcy ¶ 547.08 at 547–42 (15th ed. 1995). Writing for a unanimous Court, Justice Brandeis opined that the preferential effect of a payment must be determined:

not by what the situation would have been if the debtor's assets had been liquidated and distributed among his creditors at the time the alleged preferential payment was made, but by the actual effect of the payment as determined when bankruptcy results.

*Palmer Clay Prods.*, 297 U.S. at 229, 56 S.Ct. at 451.

Totalling TIFCO's hypothetical recovery under the March Agreement, TIFCO would have received (1) $314,483.31 (the three non-contested payments), (2) $457,881.00 (the full value of its hypothetical secured claim), and (3) some percentage of its $171,085.62 unsecured deficiency claim. Thus TIFCO would have recovered $772,364.31 plus X% of its $171,085.62 unsecured claim. Because general unsecured creditors will receive less than 100% of their allowed claims under Schwinn's liquidating Plan, TIFCO would have recovered less in a hypothetical liquidation had the payments in issue here not been made, that is less than the $943,449.93 it actually recovered under the March Financing Agreement.

Under the July Financing Agreement, again as earlier demonstrated, TIFCO's claim against Schwinn's hypothetical bankruptcy estate in Chapter 7 had the three transfers totalling $39,564 not been made would have been $118,694.79 as of the petition date. The value of TIFCO's collateral as of the same date would have been $106,070.00. Thus, if Schwinn had not made the transfers at issue under the July Financing Agreement, TIFCO would have had a secured claim pursuant to that Agreement of $106,070.00 and an unsecured claim of $12,624.79 as of the petition filing date.

Totalling TIFCO's hypothetical recovery under the July Agreement, TIFCO would have received $106,070.00 (the full value of its hypothetical secured claim) plus X% of its $12,624.79 unsecured deficiency claim. Thus, because unsecured creditors in Schwinn's liquidating Plan will receive less than 100% of their allowed unsecured claims, TIFCO would have received less in a hypothetical liquidation had the transfers not been made than the $118,694.79 it actually recovered under the July Financing Agreement.

To summarize, if Schwinn had not made the preferential transfers to TIFCO, TIFCO would have been undersecured as of the petition date on both claims. Thus, because unsecured creditors will recover less than 100% of their unsecured claims in Schwinn's liquidating Plan, TIFCO actually received more through the alleged preferential trans-fers than it would have recovered in a hypothetical Chapter 7 liquidation.

**B. TIFCO's "We Would Have Foreclosed" Argument**

 Notwithstanding the foregoing facts and analysis under law, TIFCO implies that this Court should read an additional element into § 547(b)(5). TIFCO argues that, if Schwinn had not made the questioned payments, TIFCO would have immediately canceled Schwinn's insurance policies and taken the unearned premiums as of that hypothetical date of cancellation. However, TIFCO offers no supporting authority for interpreting § 547(b)(5) to permit hypothesizing a possible course of action and then applying the law to facts as though the possible course of action had actually been followed. TIFCO asks this Court assume that it would have followed that course of action merely because it is the "custom and practice" of the insurance premium financing industry to cancel an insurance policy immediately upon the insured's default.

This Court need not reach the factual question of whether TIFCO would have automatically canceled Schwinn's insurance coverage because TIFCO's legal position is meritless, precluding summary judgment. As TIFCO asserts, the hypothetical liquidation analysis mandated by § 547(b)(5) need not be conducted in a vacuum. See, e.g., LCO Enters., 12 F.3d at 942 (Trott, J., concurring in part, dissenting in part) (citation omitted). However, TIFCO is asking this Court to do much more than simply consider the actual facts of the case when calculating the results of a hypothetical Chapter 7 liquidation. TIFCO instead argues that a possible scenario that did not ever happen should be treated as though it had occurred and the likely results of that imagined scenario be treated as if dispositive.

The results of accepting such a gloss on the actual facts would be remarkable. If TIFCO's legal position were adopted, defendants to any preference action could similarly maintain that their respective transfers were not preferences because of some action they might have taken that would have avoided application of the preference rules to them. Innumerable preference actions would

amount to nothing more than evidentiary hearings in which courts would attempt to ascertain whether a given transferee-creditor would or would not have foreclosed or done something else had an allegedly preferential transfer not been made. Parties who follow a course of action are stuck with what they did and when they did it. The "hypothetical liquidation" analysis under § 547(b)(5) does not allow parties to create a fictional set of potential but not actual facts to base that analysis upon.

 It has not been shown that Congress intended to stretch "hypothetical liquidation" analysis to such a far reaching extent and this Court declines to construe § 547(b)(5) as permitting such a stretch. In drafting the preference avoiding provisions of § 547(b), Congress intended both to discourage creditors at the early stages of a debtor's impending collapse "from racing to the courthouse to dismember the debtor during his [sic] slide into bankruptcy," and also to ensure that similarly-situated creditors are treated equally. H.R.Rep. No. 595, 95th Cong., 1st Sess. 177, *reprinted in* 1978 U.S.Code Cong. & Ad.News, 5787, at 5963, 6138; *Matter of Tolona Pizza Prods. Corp.*, 3 F.3d 1029, 1032 (7th Cir.1993) (Flaum, J., dissenting); *Matter of Smith*, 966 F.2d 1527, 1535 (7th Cir.1992) (Flaum, J., dissenting). To the extent a creditor obtains more than a pro rata share of its outstanding claim, that creditor may be found preferred over other similarly-situated creditors, regardless of that creditor's subjective intent when structuring its financing agreement or accepting the questioned payments.

Where collateral rapidly diminishes in value during the 90 days preceding bankruptcy, any payments to a secured creditor may well give that secured creditor an advantage over unsecured creditors. With or without such payments, the creditor's security interest will diminish with the passage of time, and it will recover a smaller proportion of its debt through the bankruptcy process unless advance payments are made that may be reversed as preferences. Perhaps such a result is unfair. However, it is difficult to sympathize with a sophisticated secured creditor who is aware upon contracting that the collateral will predictably depreciate over the term of the insurance coverage, and who accepts some payment on account that may be questioned in event of a bankruptcy filing. Moreover, such a result is mandated by the Bankruptcy Code, and it is not this Court's place to reconsider the appropriateness of that legislation.

Authorities dealing with related issues have not applied the movant's theory to the facts before them. *In re Paris Indus. Corp.*, 130 B.R. 1 (Bankr.D.Me.1991); *In re Auto-Train Corp.*, 49 B.R. 605 (D.D.C.1985), *aff'd Drabkin v. A.I. Credit Corp.*, 800 F.2d 1153 (D.C.Cir.1986); *see also In re McLean Indus.*, 132 B.R. 247, 263 (Bankr.S.D.N.Y.1991), *rev'd on other grounds*, 30 F.3d 385 (2d Cir.1994), *cert. denied sub nom. U.S. Lines Reorg. Trust v. United States*, — U.S. —, 115 S.Ct. 934, 130 L.Ed.2d 880 (1995). At the very least, it cannot be said on this record that movant demonstrated that it would have without doubt canceled immediately in absence of the questioned payments. Assuming *arguendo* that a demonstration of prompt cancellation in the absence of payment could have the legal effect movant argues it could have, (*cf. Alvarado v. Walsh (In re LCO Enters.)*, 12 F.3d 938, 941–42 (9th Cir.1993)), this remains a fact issue to be decided at trial. That is, even if prompt cancellation is the custom and practice of the insurance premium finance industry, there remains the fact question of whether this movant would have canceled immediately against this debtor. Indeed, movant's argument that custom and practice ends the analysis could as well prove, perhaps, that every bank forecloses on every customer as soon as mortgage payments are missed and that none of them ever defer that act for some reason.[14]

14. Movant criticizes the Dabney affidavit in its Reply brief and argues that it "should be stricken as incompetent," but filed no motion to strike it. Further, the Committee argued in its brief that it should have more time for discovery, but filed no motion for such an extension before answering the motion. The forms of such subliminal motion practice cannot be treated as motions under the rules requiring specific notice, discrete motions, and requests presented to the Court for relief and requesting ruling thereon.

In short, at this stage it is clear that the seven questioned installment payments may have been preferences under § 547(b).

## CONCLUSION

Accordingly, TIFCO's Motion for Summary Judgment is by separate order denied.